**Stanley McDONALD, Norman R. Hagfors, and Clayton Jensen, Plaintiffs-Appellees,**

v.

**JOHNSON & JOHNSON, Defendant-Appellant.**

**No. 82–1594.**

United States Court of Appeals, Eighth Circuit.

Submitted Jan. 14, 1983.

Decided Nov. 16, 1983.

Opinion on Denial of Rehearing En Banc Jan. 12, 1984.

Opinion on Granting of Rehearing Jan. 12, 1984.

Rehearing and Rehearing En Banc Feb. 28, 1984.

See also 8th Cir., 722 F.2d 1390.

---

William F. Baxter, Asst. Atty. Gen., Barry Grossman, Nancy C. Garrison, Attys., Dept. of Justice, Washington, D.C., for United States as amicus curiae.

Patterson, Belknap, Webb & Tyler, New York City, Maslon, Edelman, Borman, Brand & McNulty, Minneapolis, Minn., for defendant-appellant Johnson & Johnson; George S. Frazza, Roger S. Fine, James E. Farrell, Jr., New Brunswick, N.J., David F. Dobbins, Theodore B. Van Itallie, Jr., New

York City, Wilmer, Cutler & Pickering, Washington, D.C., of counsel.

Warren Spannaus, Atty. Gen., State of Minn., Stephen P. Kilgriff, Thomas F. Catania, Jr., Sp. Asst. Attys. Gen., Antitrust Div., St. Paul, Minn., for State of Minn.

Daniel R. Shulman, Minneapolis, Minn., Joseph M. Alioto, San Francisco, Cal., for plaintiffs-appellees; Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., Alioto & Alioto, San Francisco, Cal., of counsel.

Before LAY, Chief Judge, and HEANEY and FAGG, Circuit Judges.

LAY, Chief Judge.

On May 2, 1979, Messrs. McDonald, Hagfors, and Jensen filed suit against Johnson & Johnson (J & J), a corporation whose subsidiaries compete in the prescription and over the counter drug markets, alleging violations of sections 1 and 2 of the Sherman Act, section 7 of the Clayton Act, breach of contract, and fraud. After a five and one-half month jury trial, a verdict was returned against J & J on all counts except the Clayton Act violation. The following alternative damages were awarded: $170.4 million (treble $56.8 million compensatory damages) under section 1 of the Sherman Act; $170.4 million (treble $56.8 million compensatory damages) under section 2 of the Sherman Act; $5.7 million for breach of contract; $6.275 million actual damages and $25 million punitive damages for fraud.

In an opinion denying J & J's alternative motions for judgment notwithstanding the verdict or a new trial, District Judge Miles Lord summarized the facts and discussed the issues of law. *McDonald v. Johnson & Johnson,* 537 F.Supp. 1282 (D.Minn.1982). For purposes of appeal, we need only briefly summarize the historical facts.

Prior to 1974, McDonald, Hagfors, and Jensen (MH & J) (plaintiff-appellees) owned StimTech (ST), a corporation that manufactured TENS[1] devices and pacemakers. Hagfors originally had worked for another company in the field of nerve stim-

ulation for the treatment of pain and in the heart pacemaker field. After incorporating ST in 1970, he designed the first modern solid-state TENS device. McDonald and Jensen became stockholders and officers of ST shortly thereafter.

In 1973, J & J (defendant-appellant), purchased 37.1% of ST's stock for $700,000. In 1974, after extensive negotiations, J & J purchased the remaining ST stock to make ST a wholly-owned subsidiary. The 1974 acquisition agreement provided that J & J would pay a minimum of $1.3 million for 63% of ST stock, and a maximum of $7 million based on the amount of ST's profits during a five-year earnout period from 1975 through 1979. The stock purchase contract contained a provision that stated:

> Stockholders and Johnson & Johnson agree that each will at all times act in respect to its dealings with the Company and its operations, and subject to the exercise of reasonable business judgment, act [sic] in such a way as to promote to the extent reasonably possible the successful operation and growth of the Company.

The three plaintiffs, MH & J, also entered into five-year noncompete agreements and three-year employment contracts. The employment contracts automatically renewed for successive one-year periods after the first three years, unless terminated by J & J, which it could do with three months notice at any time after the first three years.

When J & J took over ST in 1974, ST had lost, under the operation of the three plaintiffs, over $400,000. Between 1974 and 1979, J & J supplied ST with $10.9 million of working capital. In 1975, ST had net TENS sales of $780,000, about 25–30% of the infant industry's sales; under J & J's ownership, ST's net TENS sales reached $5.4 million by 1979, which was also about 25–30% of industry sales.[2] Between 1975 and 1979, ST had increased its sales sevenfold, but had aggregate operating losses of

---

1. "TENS" is an abbreviation for trancutaneous electronic nerve stimulators; they are used to treat pain by sending electric currents into the body through electrodes attached at the site of the pain.

2. The TENS industry had only four firms in 1974; it had expanded to about thirty firms by 1979. Since 1975, no firm has ever had more than a 31% market share.

$7.3 million. Because of the losses MH & J never received any more than the minimum payment of $1.3 million for their stock. While employed by J & J, McDonald was demoted. He then left the company in 1977. Hagfors was demoted and left in 1977; Jensen was discharged in 1977. J & J claims the two demotions and the firing were due to incompetence.

On appeal, J & J attacks the sufficiency of the evidence to sustain plaintiffs' recovery for the antitrust violations under sections 1 and 2 of the Sherman Act. Various objections are raised concerning the instructions given relating to the component proofs required to successfully sustain a claim under the Sherman Act; in addition, the damage awards are attacked as being based on conjectural and speculative evidence. More significant to our decision, J & J also challenges plaintiffs' standing to sue for antitrust violation.

J & J similarly challenges the sufficiency of the evidence to sustain proof of fraud, and alternatively the verdict for breach of contract; in addition, it is argued that the damages are excessive and based upon speculative proof. The $25 million punitive damages award for the fraud claim is similarly challenged.

We find that sufficient evidence was provided to sustain the claim for fraud and damages causally related thereto. We therefore sustain the plaintiffs' verdict for $6.275 million for actual damages; we find, however, that the $25 million verdict for punitive damages was based on prejudicial evidence and argument and a new trial must be held in this regard.

We vacate the judgment based on sections 1 and 2 of the Sherman Act antitrust claims for lack of standing. We hold that the antitrust laws were not designed to provide stockholders, who may have been defrauded in the sale of their stock, a remedy. Their loss is not causally related to the effects of lessening of competition and the law recognizes other remedies for these plaintiffs. In doing so, we only acknowledge that even if we assume standing, it is readily apparent that plaintiffs have a great burden to establish a per se violation of section 1 of the Sherman Act. To suggest plaintiffs' proof of acquisition and suppression meets traditional tests of establishing a per se violation of restraint of trade under section 1, which would conclusively presume that the agreement and practices are so pernicious and harmful to competition that the precise harm or business excuse need not be studied, would indeed, under the circumstances, be an unusual and unprecedented decision. *Cf. Worthen Bank & Trust Co. v. National BankAmericard, Inc.,* 485 F.2d 119 (8th Cir.1973), *cert. denied,* 415 U.S. 918, 94 S.Ct. 1417, 39 L.Ed.2d 473 (1974). We express no opinion whether J & J's conduct was violative of the Sherman Act as tested by the "rule of reason." We need not meet these difficult issues because we find plaintiffs did not demonstrate standing to sue for J & J's alleged violations of the antitrust law.

## I. STANDING

Standing for antitrust violations is governed by section 4 of the Clayton Act: "Any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws may sue therefor . . . ." In *Associated General Contractors v. California State Council of Carpenters,* —— U.S. ——, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) it is acknowledged that earlier Supreme Court cases have read the statute expansively. *Id.* at 904. *See, e.g., Mandeville Farms v. Sugar Co.,* 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948). However, *Associated General* now makes clear that the standing question requires an evaluation of the plaintiffs' harm, the alleged wrongdoing by the defendants, and the relationship between them. 103 S.Ct. at 907.[3] The Court further points out that antitrust standing goes beyond the constitutional standard of "injury in fact"

---

**3.** *See also Blue Shield of Virginia v. McCready,* 457 U.S. 465, 477, 102 S.Ct. 2540, 2547, 73 L.Ed.2d 149 (1982) ("It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property.").

and includes a determination whether the plaintiff is a proper party to bring a private antitrust action. *Id.* n. 31.

Whether the plaintiffs are proper parties depends on the factors articulated in *Associated General.* These are: (1) The causal connection between the alleged antitrust violation and the harm to the plaintiff; (2) Improper motive; (3) Whether the injury was of a type that Congress sought to redress with the antitrust laws; (4) The directness between the injury and the market restraint; (5) The speculative nature of the damages; (6) The risk of duplicate recoveries or complex damage apportionment. The court is to weigh these factors in determining whether to enforce a plaintiff's antitrust claim. *Id.* at 908–12.[4]

As we weigh these factors, the evidence will be viewed in the light most favorable to the jury verdict and therefore it will be assumed that J & J did suppress the TENS market.

■ Although there may be shown some causal link between "the mere presence of a violator in the market" and harm caused to a plaintiff, more must be shown. As the landmark decision of *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), makes clear, a mere causal connection between an antitrust violation and harm to a plaintiff cannot be the basis for antitrust compensation unless the injury is directly related to the harm the antitrust laws were designed to protect.

In the present case, it is insufficient for plaintiffs to simply assert that plaintiffs' damages would not have been incurred without defendant's suppression of the TENS market. Assuming the proof of such fact, assuming further that defendant acted with an improper motive, as the jury finding would seem to sustain, we find there was no proximate causation[5] between plaintiffs' harm and the alleged illegal market restraint. Assuming there was market restraint—that is, the suppression of competition—by defendant's alleged violation of §§ 1 or 2, there is no showing that a harmful effect on TENS competition caused plaintiffs any antitrust injury. Furthermore, we deem it significant the damages awarded by the jury for the antitrust violation were entirely speculative, further corroborating the lack of antitrust injury. The bottom line is that the evidence clearly does not support a finding that plaintiffs' injury was of a type Congress sought to redress by the antitrust laws.

■ First, we turn to the identity of the parties. Although plaintiffs initially represented the majority shareholders of ST and for purposes of discussion might be described as the sole representative of ST's interests, it is clear that by selling their stock plaintiffs voluntarily withdrew individually and in their representative capacity from further competition in the TENS market. Cases are legion that preclude plaintiffs' standing to bring suit for antitrust violations when they have voluntarily withdrawn from the market. *See, e.g., Chrysler*

---

4. The *Associated General* test is further illuminated by the Supreme Court's actions in three circuit cases in which certiorari had been requested. In the two cases in which antitrust standing had been granted, the Supreme Court granted certiorari, vacated, and remanded for further consideration in light of *Associated General. H.S. Crocker Co. v. Ostrofe,* —— U.S. ——, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983); *Mitsui & Co., Ltd. v. Industrial Investment Development Corp.,* —— U.S. ——, 103 S.Ct. 1244, 75 L.Ed.2d 475 (1983). Significantly, the Supreme Court denied certiorari in the third case, in which the circuit court affirmed a judgment for defendants on the basis of lack of standing. *Bichan v. Chemetron Corp.,* 103 S.Ct. 1261 (1983); *see In re Industrial Gas Antitrust Litigation,* 681 F.2d 514, 517–20 (7th Cir.1982).

5. The Supreme Court has injected into the § 4 standing inquiry an element of proximity:

> In the absence of direct guidance from Congress, and faced with the claim that a particular injury is too remote from the alleged violation to warrant § 4 standing, the courts are thus forced to resort to an analysis no less elusive than that employed traditionally by the courts at common law with respect to the matter of "proximate cause."

*Blue Shield of Virginia v. McCready,* 457 U.S. 465, 477, 102 S.Ct. 2540, 2547, 73 L.Ed.2d 149 (1982). *See also Associated General Contractors v. California State Council of Carpenters,* —— U.S. ——, 103 S.Ct. 897, 905–07, 74 L.Ed.2d 723 (1983) (§ 4 inquiry subject to proximate cause constraints).

*Corp. v. Fedders Corp.,* 643 F.2d 1229 (6th Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 388, 70 L.Ed.2d 207 (1981); *A.D.M. Corp. v. Sigma Instruments, Inc.,* 628 F.2d 753 (1st Cir.1980); *Peterson v. Borden Co.,* 50 F.2d 644 (7th Cir.1931); *Snyco, Inc. v. Penn Central Corp.,* 551 F.Supp. 949 (E.D.Pa.1982); *Turner v. Johnson & Johnson,* 549 F.Supp. 807 (D.Mass.1982); *VTR, Inc. v. Goodyear Tire & Rubber Co.,* 303 F.Supp. 773 (S.D.N.Y.1969).[6]

In *Chrysler Corp. v. Fedders Corp.,* 643 F.2d 1229 (6th Cir.), *cert. denied,* 454 U.S. 893, 102 S.Ct. 388, 70 L.Ed.2d 207 (1981), for example, the court denied antitrust standing to a corporation that sold its assets and covenanted not to compete; the court's decision was based on the fact that no *Brunswick* "antitrust injury" was alleged since the corporation had voluntarily withdrawn from the market. Chrysler Corp. had entered into a 76 page agreement to sell virtually all the assets of its Airtems Division to Fedders Corp. in return for cash, some Fedders' stock, a note, and the assumption of certain liabilities. 540 F.Supp. 706, 708 (S.D.N.Y.1982) (connected case); *see* 643 F.2d at 1231.

Chrysler also covenanted, with certain exceptions, not to compete in the nonautomotive air conditioning market for a five-year period. 643 F.2d at 1231. Chrysler became dissatisfied with the agreement after Fedders allegedly failed to pay several million dollars due under the contract. Chrysler filed a claim for a violation of section 1 of the Sherman Act against Fedders and others, alleging they had conspired to manipulate the nonautomotive air conditioning market in a manner calculated to lessen competition by eliminating Chrysler as a competitor. *Id.* at 1231–32. The district court denied standing on this claim, characterizing Chrysler's allegation as a "breach of contract action which lacked the element of antitrust injury required by *Brunswick*." *Id.* at 1231. The Sixth Circuit affirmed the holding on this allegation, correctly foreseeing that *Brunswick* should be interpreted "to mean that the pleading of 'antitrust injury' is an essential component of standing under § 4 of the Clayton Act" (footnote omitted), and thus a court should "focus on the *type* of injury pleaded and its relationship to the alleged anticompetitive conduct." *Id.* at 1234–35. As to Chrysler's injury, the Court reasoned:

In the present case, Chrysler's primary allegation is that it has been eliminated from competition with the defendants by the virtual destruction of the Airtemp Division and its affiliated foreign subsidiaries. Chrysler contends that Fedders' failure to fulfill its obligations under the contract gave the Fedders defendants the financial power to effect this destruction. Chrysler does not suggest that the contract itself violates the antitrust laws; rather, it claims that Fedders' subversion of that agreement was the anticompeti-

**6.** *Turner v. Johnson & Johnson,* 549 F.Supp. 807 (D.Mass.1982) was a similar action against the same defendant. The court analyzed the alleged injuries under the *Brunswick* "antitrust injury" test and denied antitrust standing to the plaintiffs.

The plaintiffs included the trustees of the AMEC Liquidating Trust, which was the successor in interest to the AMEC company, and Robert Turner, who was the president and founder of the AMEC company and inventor of its line of "Meditem" electronic thermometers. *Id.* at 809. J & J's subsidiary had developed and was to market its own "Survalent" electronic thermometer. After extended negotiations, AMEC's assets were sold to J & J under a contract that apparently provided for royalty payments to plaintiffs based on the amount of future sales of Meditemp.

The plaintiffs subsequently brought a suit for fraud and antitrust violations under sections 1 and 2 of the Sherman Act and section 7 of the Clayton Act. The plaintiffs alleged that, through fraud and misrepresentation, J & J acquired the assets of AMEC for the purpose of suppressing it and eliminating competition between AMEC's Meditemp thermometer and J & J's Survalent thermometer. *Id.* at 809. It alleged that J & J made certain false representations during the contract negotiation; that J & J caused a patent interference proceeding to be filed to create a question concerning the validity of AMEC's patent to put AMEC in a difficult position if negotiations with J & J fell through; and that after acquisition J & J suppressed Meditemp by not providing sufficient funding, manpower, or equipment to develop and market successfully the product. *Id.* at 809–10. Eventually, J & J discontinued Meditemp and never returned the business to AMEC, which was allegedly contrary to the written sales agreement. *Id.* at 810.

tive means of eliminating Chrysler from the market.

We hold that these alleged injuries do not constitute "anti-trust injury" within the meaning of *Brunswick, supra.* By contracting to sell virtually all the assets of the Airtemp Division and all but two of its foreign subsidiaries, Chrysler voluntarily withdrew from competition in the non-automotive air-conditioning market. It did not contemplate continuing to compete in that market and in fact covenanted not to do so except through the Australian and South African subsidiaries.

Even if a breakdown of competitive conditions in the market has indeed occurred, Chrysler's loss is not attributable to that change. Chrysler would have suffered an identical loss if the defendants had failed to make payments under the contract for reasons unrelated to the alleged antitrust violations. *Cf. Brunswick, supra,* at 487, 97 S.Ct. at 696. Moreover, if the defendants had fulfilled their obligations as agreed, Chrysler would have no complaint, yet would still be divested of its assets and precluded from competing in the market. *See A.D.M. Corp. v. Sigma Instruments, Inc.,* 628 F.2d 753 (1st Cir.1980). Therefore, to

the extent that Chrysler alleges damages resulting from its elimination from competition with the defendants through the Airtemp Division and the subsidiaries included in the contract for sale, it lacks the "essential connection between injury and the aims of the antitrust laws" necessary to establish standing. *A.D.M. Corp., supra,* at 754.

643 F.2d at 1235.[7]

It should be clear here that if the sale of ST assets and the merger agreement (the primary basis of the § 7 Clayton Act claim and the § 1 Sherman Act claim) had an effect on competition within the market, it was completely unrelated to plaintiffs' harm. Any resultant effect on competition by reason of the merger would have occurred whether or not plaintiffs were harmed. Thus, the indirectness of plaintiffs' injury to any antitrust violation is made clearly visible. In the present case, the jury, in finding for the defendant under § 7 of the Clayton Act, necessarily found there was no effect on competition by the sale itself. Plaintiffs thus argue that it was the subsequent suppression that caused the lessening of the product competition. Assuming this to be so, we find plaintiffs' harm is directly related to their contractual

---

7. An early case cited in *Brunswick,* 429 U.S. at 488 n. 13, 97 S.Ct. at 697 n. 13, as an example of an unsuccessful antitrust suit for damages for injuries unrelated to the reason the merger was prohibited is *Peterson v. Borden Co.,* 50 F.2d 644 (7th Cir.1931). The plaintiffs, as minority stockholders in Clover Leaf Milk Co., had alleged that the majority stockholders, in a conspiracy with the Borden Co., a milk business competitor, induced them through false representations to sell their stock to the majority for less than fair value. *Id.* at 645. The majority then conveyed all the assets of Clover to Borden in exchange for Borden stock; Clover was then dissolved. The plaintiffs sued Borden for treble damage, alleging the effect of the transaction was to substantially lessen competition and to create a monopoly. The court found that although the fraudulent conduct of the purchaser injured the plaintiffs in the sale of their stock, not one of the plaintiffs was a person "injured in his business or property by reason of anything forbidden in the antitrust laws" under section 4. *See id.* at 646. The court explained:

Whatever of other infirmities the declaration may disclose, we are met at the outset

with the utter want of causal relation between the alleged injury to plaintiffs and the alleged statutory transgression by any of defendants. The statute was not designed to give to stockholders who have been defrauded in the sale of their stock treble damages for their injuries, nor indeed any new or additional remedy for such injury. If they have been thus defrauded, the law aside from the anti-trust statutes affords ample remedy. The sale of corporate stock holds no different relation toward the statute here invoked than would a horse trade, or any other transaction between parties.

... We do not understand how a stockholder of an absorbed corporation who parted with his stock for less than its actual value can attribute his loss to the substantial lessening of competition or the creation of monopoly through acquirement of the corporate stock by a corporate competitor. The competition destroyed or the monopoly created could not injure him in his relation as a stockholder of the acquired corporation, since he had parted with his stock.

*Id.* at 645–46.

agreement and only indirectly caused by J & J's alleged suppression of ST in the TENS market.

■ Even if the injury to the plaintiffs is characterized as directly linked to any antitrust wrongdoing by J & J because the "suppression of the plaintiffs individually was a necessary step for Johnson & Johnson to take in achieving the overall suppression of the TENS industry," *McDonald,* 537 F.Supp. at 1325, the type of injury the plaintiffs suffered is not the type the antitrust laws were intended to redress. *See Associated General,* 103 S.Ct. at 910 n. 44 ("We ... need not decide whether the direct victim of a boycott, who suffers a type of injury unrelated to antitrust policy, may recover damages when the ultimate purpose of the boycott is to restrain competition in the relevant economic market."). In exchange for the guarantee of receiving $1.3 million for their stock, the $5.7 million contingent earnout, and the three-year employment contracts, the plaintiffs willingly surrendered their stock in ST and their status as actual or potential competitors of J & J for the next five years. Contrary to the district court's portrayal of the situation that the plaintiffs "in no way intended to withdraw from the TENS industry," 537 F.Supp. at 1329, the plaintiffs clearly intended to withdraw as *competitors* in the pacemaker and pain control markets by signing the noncompete agreements.[8] The fact that the plaintiffs expected to work in the industry as employees of J & J for at least three years,[9] and anticipated the contract earnout because of J & J's representations does not permit them to successfully distinguish the *A.D.M., Chrysler, Peterson, Snyco, Turner* line of cases.

*Snyco,* 551 F.Supp. at 950, and presumably *Turner,* 549 F.Supp. at 809–11, *see supra* note 6, also involved contract payouts that were contingent on the profits of the company sold to the alleged violator; these courts did not accord any antitrust significance to the fraud or breach of contract involved in the sale price ultimately paid under the contracts. By agreeing to accept the earnout under the contract with J & J, McDonald, Hagfors, and Jensen were voluntarily functioning as mere contract creditors who were formerly market participants. Similar to the situations in *Chrysler, A.D.M., Snyco,* and *Turner,* had the plaintiffs received the full contingent earnout in the contract, they would not have been harmed and clearly could not sue. However, they would still be divested of their assets and precluded from competing for five years, even though an injury to the TENS industry may have occurred. If the sale of ST and its alleged subsequent suppression had a negative effect on competition in the TENS industry, it would have occurred whether or not the plaintiffs were harmed. *See A.D.M.,* 628 F.2d at 754. Likewise, as in *Chrysler,* 643 F.2d at 1235, the plaintiffs would not have received the full earnout if J & J had failed to make payments because of a poor economy or a variety of other reasons unrelated to the alleged antitrust violation. The injuries to the plaintiffs flowed from the alleged fraud and breach of contract, not from suppressed competition in the TENS or other product markets; thus, the plaintiffs did not suffer a *Brunswick* "antitrust injury."

Although none of the "market withdrawal" cases involved seller-plaintiffs who accepted employment contracts with the buyer-defendants, the fact that MH & J continued in the industry as employees of J & J under five-year noncompete contracts does not alter the fact that they voluntarily withdrew as competitors and thus lack "antitrust injury." As employees, the only market the plaintiffs would have a personal stake in would be the labor market in that industry, not the TENS market at which the conspiracy was aimed. As employees, MH & J agreed to accept certain annual salaries and benefits. 537 F.Supp. at 1318.

---

**8.** There is no allegation that these noncompete agreements are in themselves unreasonable restraints of trade. *See infra.*

**9.** McDonald stayed as an employee of J & J for 2½ years before he voluntarily left and was released from his noncompete agreement to buy another pain control company. *Id.* at 1319, 1328. The other two plaintiffs finished out the three years as employees of J & J, although at the end of that time period. Jensen was fired. *Id.* at 1319, 1328–29.

Whether or not ST achieved the potential in the market the plaintiffs envisioned, the plaintiffs as employees were still subject to receiving such salaries and being discharged without cause after three years. Any competition restrained in the labor market by reason of the plaintiffs' employment contracts and the agreements not to compete was only brought about by plaintiffs' voluntary and negotiated contractual choice. *Cf. Snyco,* 551 F.Supp. at 952 ("the diminished number of competitors results from [corporate] plaintiff's voluntary, contractual *withdrawal from the market*"). This is unlike the situation in which an employee challenges an alleged boycott in the *employment market* of his and other employees' services. *See Radovich v. National Football League,* 352 U.S. 445, 448–49, 453–54, 77 S.Ct. 390, 392–393, 394–95, 1 L.Ed.2d 456 (1957) (alleged conspiracy among football teams to boycott players breaking standard contract is subject to antitrust damages claim by boycotted player); *Ostrofe v. H.S. Crocker Co.,* 670 F.2d 1378, 1390–91 (9th Cir.1982) (Kennedy, J., dissenting).

■ Regarding the covenants not to compete in this case, we note that covenants not to compete have been used as parts of schemes to unlawfully restrain trade. *Schine Chain Theatres, Inc. v. United States,* 334 U.S. 110, 119, 68 S.Ct. 947, 952, 92 L.Ed. 1245 (1948); *United States v. Crescent Amusement Co.,* 323 U.S. 173, 181, 65 S.Ct. 254, 258, 89 L.Ed. 160 (1944); *United States v. American Tobacco Co.,* 221 U.S. 106, 183, 31 S.Ct. 632, 649, 55 L.Ed. 663 (1911). However, covenants not to compete generally are not violative of the antitrust laws. *United States v. Empire Gas Corp.,* 537 F.2d 296, 307 (8th Cir.1976). When the goodwill of a business is sold along with its other assets, such a covenant, if reasonably limited in time and geography, is necessary to protect the buyer's legitimate interests. *See id.; Syntex Laboratories, Inc. v. Norwich Pharmacal Co.,* 315 F.Supp. 45, 56–57 (S.D.N.Y.1970).

■ This case is not alleged to be a situation as in *Schine, Crescent,* or *American Tobacco* in which the United States brought suit against competitors who forced or attempted to force other competitors to sell out to them by threats or other predatory conduct, and extracted covenants not to compete through superior bargaining position. Nor is it alleged that the covenants themselves were unreasonable in scope or duration and should thus not be enforced. Rather, the plaintiffs point to the existence of the covenants as evidence of the underlying conspiracy to suppress the TENS industry. Such evidence would be admissible in a criminal antitrust suit brought by the United States against J & J or in an antitrust damages suit brought by actual or potential competitors in the TENS market or other product markets alleged to be injured by the suppression of ST and the TENS industry. However, the mere presence of such covenants ancillary to the voluntary sale of the plaintiffs' business cannot be used to bootstrap fraud and contract claims into an antitrust suit. *See Chrysler Corp. v. Fedders Corp.,* 643 F.2d at 1231–35; *Snyco, Inc. v. Penn Central Corp.,* 551 F.Supp. at 950–53.

■ Finally, we think it clear that the damage award for this violation of the antitrust laws is not only speculative, but serves to corroborate the lack of plaintiffs' direct injury from the alleged market restraints. The jury awarded plaintiffs $56.8 million as compensatory damage. Yet as plaintiffs have attempted to otherwise prove, their actual damage from the fraud or breach of contract was $5.7–6.2 million. Plaintiffs urge that $56 million is ST's damage from not being allowed to survive and compete in the market; this figure would allegedly have been its projected profit. But this argument is not only conjectural in amount, it basically fails to recognize that had J & J successfully manufactured the TENS device, the profit would have been J & J's and the only derivative share plaintiffs would have received was their contracted earnout compensation awarded in their suit for fraud.

■ Plaintiffs further urge that by the suppression, competition in the TENS industry was harmed. But surely plaintiffs cannot claim damages for the entire industry. In this regard, it is difficult to understand just how the competition in the TENS industry was harmed—ST's competi-

tors arguably were better off by J & J's suppression of its own TENS product. Even if the competitors were not better off, J & J had no duty to competitors or consumers to promote its own product. This is an internal, private business decision. *Cf. GAF Corp. v. Eastman Kodak Co.,* 519 F.Supp. 1203, 1231 (S.D.N.Y. 1981) (firm's failure to introduce a product is not anticompetitive). Nor can plaintiffs' individual withdrawal from the market—separating themselves from ST (somewhat inconsistent with plaintiffs' overall theory)—be the basis for projected profits. Another theory we inferentially glean from plaintiffs' argument is that plaintiffs' harm is based upon J & J's further intrenchment in the analgesic market by removing ST and its competition in the related field of pain control. Assuming this true, plaintiffs' harm clearly did not result from such alleged market restraints.

In sum, we find that (1) plaintiffs voluntarily withdrew themselves from competition; (2) there was no causal connection between plaintiffs' harm and the alleged market restraint; (3) there was only speculative damage shown; and (4) any injury plaintiffs have shown was not a type that Congress sought to redress under the antitrust laws.

Since the plaintiffs have not proven "antitrust injury," a solid line of case law mandates a judgment notwithstanding the verdict to dismiss the plaintiffs' antitrust claims for failure to prove damages cognizable under the antitrust laws. If consumers or competitors in the product markets suffered "antitrust injuries," they should be the ones with capacity to sue under the antitrust laws for the violations alleged here. *Cf. Southaven Land Co. v. Malone & Hyde, Inc.,* 715 F.2d 1079 (6th Cir.1983).

We vacate the judgment on the antitrust claim and remand with directions to dismiss the counts dealing with these claims.

## II. THE FRAUD CLAIM

J & J challenges the fraud claim on several grounds. First, it argues that the alleged oral assurance that a full earnout would be returned to the plaintiffs was merely a prediction of a future event; second, that no credible evidence exists that such an assurance was made; third, that the alleged promises of generalized assistance to ST were not actionable; fourth, assuming a *prima facie* case of fraud was established, that no ascertainable damage was shown; last, that the trial court erred in failing to submit J & J's *in pari delicto* defense. We discuss these claims seriatim.

J & J first alleges that a prediction of a future event cannot be the basis of an actionable misrepresentation. The evidence adduced at trial shows that J & J made assurances of what it was going to do for ST after the acquisition. These assurances were material promises to be performed in the future by the defendant. Under controlling Minnesota law, when such promises are made with the intent to defraud and without the intent to perform, this constitutes actionable fraud. *Vandeputte v. Soderholm,* 298 Minn. 505, 216 N.W.2d 144, 147 (1974); *Wojtkowski v. Peterson,* 234 Minn. 63, 47 N.W.2d 455, 458 (1951).

Second, J & J argues that no credible evidence exists that it assured plaintiffs of receiving a full earnout. We find this argument to be without merit because plaintiffs' fraud claim did not rest on any "guarantees" of payment. Rather, plaintiffs' theory was that J & J made material promises to be performed in the future which were made with the intent to defraud and which were never intended to be performed by J & J. These promises were related to the general promotion of ST.[10]

10. For example, the district court, in reciting the facts, observed:
Mr. Whitlock admitted at the trial that he told the plaintiffs that Johnson & Johnson had the resources and would put them to work for StimTech in an effort to make StimTech "tops in the pacer business" and that the Johnson & Johnson name would be behind StimTech. The evidence revealed that the defendant represented that it would furnish substantial research and development funds, marketing assistance, administrative assistance, etc., in an effort to promote StimTech and its products to the fullest extent. 537 F.Supp. at 1352.

Third, J & J urges that the supposed generalized promise to make "an effort" to promote ST cannot be a basis for the fraud claim and should have been dismissed because (a) the evidence contradicts the alleged promises, (b) even if the promises were made, J & J made the requisite effort, (c) any alleged promise to promote is contrary to the contractual good faith standard of conduct, and (d) whether the contract terms contradicted the alleged oral representations is a question of law and should not have been decided by the jury.

As to (a) and (b) above, there was sufficient evidence for the jury to find to the contrary.[11]

With regard to (c), we cannot find any inconsistency between the acquisition agreement and J & J's alleged representations that J & J would provide marketing, financial, managerial, and other assistance to ST. The evidence shows representations that J & J would permit the plaintiffs to remain with ST and run the business; that the J & J name would be behind ST; and that J & J would do everything possible to assist ST so that it could produce sales and profits sufficient to generate the maximum earnout payments. Moreover, the court specifically instructed the jury that it could not return a verdict for the plaintiffs on the basis of any representations directly contradicted by the September 20, 1974, agreement. We must assume that the jury properly regarded these instructions, especially when there is evidence to support the jury's findings.

J & J also argues that whether the contract terms contradicted the alleged oral representations is a question of law and should not have been decided by the jury. We respectfully disagree.

The district court instructed the jury that "where the parties' contract contradicts the allegedly false representation, plaintiffs' reliance on the representation is not reasonable under the circumstances." J & J admits that this is a correct statement of law, but asserts that the jury was not the one to apply it. J & J relies on the principle that a contract must be interpreted and enforced according to its terms, and such interpretation is primarily a question of law. This argument fails for three reasons. First, although interpreting a contract may be a question of law, it does not follow that determining whether a representation contradicts a contract is also a question of law. To the contrary, whether a representation contradicts a contract is question of fact, or at best a mixed question of law and fact. Second, J & J made no objection to the applicable instruction at trial or in its post-trial motions. Third, even if the determination were a question of law, we find the representations do not contradict the contract.

J & J's fourth challenge to the fraud claim is that even assuming that plaintiffs made out a *prima facie* case of fraud, they failed to prove any damages. The district court instructed that the appropriate measure of compensatory damages was the difference between the value of the plaintiffs' stock in ST and what they actually received for it. Plaintiffs received $1.3 million; they testified that the stock was worth at least $7 million. Mr. Whitlock, vice chairman of J & J's Executive Committee, admitted that he sought authority from the Executive Committee to purchase the ST

---

11. *See supra* note 10. Additionally, the evidence revealed that:

Within six months of the acquisition, Johnson & Johnson imposed a number of restrictive and suppressive requirements upon StimTech, including: The hiring freeze; the imposition of the requirement that research and development be funded only out of gross profits; the transfer pricing policy; Devices' acquisition of exclusive distribution rights for StimTech products for the United Kingdom and Europe; the humiliation and demotion of Mr. McDonald; the prohibition against using the Johnson & Johnson name; the prohibition against expansion of international and domestic business; the prohibition against any mini-plants; the direction to cut inventories 40% when StimTech was experiencing shortages of inventories; the curtailment of StimTech's programmable pacemaker development; and the prohibition against StimTech displaying its products at Johnson & Johnson's annual meeting as other Johnson & Johnson companies were allowed to do. 537 F.Supp. at 1352.

stock for $8 million because that is what he thought it was worth. We find that this is sufficient evidence to sustain the jury's damage award on the fraud claim.

J & J stressed at oral argument that since the contract only provided the plaintiffs with a maximum of $5.7 million in addition to the $1.3 million already paid, the most the jury could award would be $5.7 million. J & J argues that the amount over $5.7 million is therefore excessive. We do not agree. There is evidence in the record that J & J made representations to plaintiffs to the effect that they would receive certain executive benefits in addition to the payout. The jury could have found these to equal the difference.

J & J's final challenge to the fraud claim is that the district court erred in refusing to submit J & J's *in pari delicto* defense. The essence of this defense is that plaintiffs concealed from J & J that their previous employer had fired them for incompetence, and that J & J would not have bought ST had it known this fact. The district court allowed the defendants during trial to explore the area of nondisclosure on the part of the plaintiffs. However, the evidence revealed only that McDonald and Hagfors left the employment of their previous employer due to personality conflicts. J & J failed to provide evidence that plaintiffs were fired for incompetence. Moreover, there was no evidence of any reliance upon this alleged nondisclosure.

Under the circumstances we find no prejudicial error in the district court's refusal to submit an instruction on the *in pari delicto* defense.

Because we find no merit to J & J's challenges of the fraud claim, we affirm the jury's award of $6.275 million.

## III. PUNITIVE DAMAGES

Based on the fraud count, the district court submitted the question of punitive damages to the jury. The jury returned a verdict for $25 million. J & J challenges the punitive damages award as being excessive and based upon prejudicial factors.

The district court instructed the jury: "If you decide to award punitive damages, then your award should be measured by such factors as the seriousness or degree of any damage defendant's conduct caused to the general public." This is a correct statement of Minnesota law with respect to punitive damages. The relevant statute states:

Any award of punitive damages shall be measured by those factors which justly bear upon the purpose of punitive damages, including the seriousness of hazard to the public arising from the defendant's misconduct, the profitability of the misconduct to the defendant, the duration of the misconduct and any concealment of it, the degree of the defendant's awareness of the hazard and of its excessiveness, the attitude and conduct of the defendant upon discovery of the misconduct, the number and level of employees involved in causing or concealing the misconduct, the financial condition of the defendant, and the total effect of other punishment likely to be imposed upon the defendant as a result of the misconduct, including compensatory and punitive damage awards to the plaintiff and other similarly situated persons, and the severity of any criminal penalty to which the defendant may be subject.

Minn.Stat. § 549.20(3) (1982).

■ Punitive damages are designed to punish the offender for his malicious or oppressive conduct. *Nye v. Blyth Eastman Dillion & Co.,* 588 F.2d 1189, 1200 (8th Cir. 1978). In the present case, it is highly relevant that the malicious or oppressive conduct must have been related to the *fraud,* not the *suppression.* Punitive damages beyond the statutory trebled damages cannot be awarded for an antitrust violation. The enhancement of damages in an antitrust case is the damages trebled. *See Clark Oil Co. v. Phillips Petroleum Co.,* 148 F.2d 580, 582 (8th Cir.) (antitrust damage provision embodies both punitive and compensatory damages), *cert. denied,* 326 U.S. 734, 66 S.Ct. 42, 90 L.Ed. 437 (1945). A separate award for punitive damages would at the very least become duplication.

■ The record makes clear that plaintiffs argued to the jury that it could punish

J & J for the suppression. Counsel used the court's punitive damages charge to inject an inflammatory remark concerning "public damage" directly related to the alleged antitrust violation of suppression.

Plaintiffs' counsel argued:

Before we go any further, "seriousness or degree of any damage the defendant's conduct caused to the general public." There is no amount of money that can any way, any way, satisfy that requirement—none. Because the seriousness and the degree of damage that they have caused to the general public is incalculable, even if it were but one person, one person, as you saw in this study when they were trying to evaluate in terms of money.

That's the way you have to do it, in terms of money—evaluate what it is in the pain market.

They say it's $50 billion it costs. But they say the pain itself to the patients is immeasurable. The amount there is immeasurable! You can never calculate that! You can never calculate that!

So how do we do this? I don't know. I really don't know. I will tell you what I do know and what we in this courtroom, we know, and J & J knows and all those people, all of the people, so-called chronic pain sufferers, every one of them.

The drugs—Tylenol with Codeine, Zomax, whatever—are absolutely worthless to them. That is uncontested, that the drugs cannot do anything for those people—nothing!

Yet the chronic pain patients spend $300 million a year on this fake, on these pills that do nothing, because they're looking for anything they can get their hands on to relieve their pain, and J & J above all of them knows that that [TENS] would help them!

We're a $5 billion company. We can't be fooling around with this small-time stuff [TENS]. Now, that—that is an obligation.

Tr. 13,159–60.[12]

Plaintiffs ultimately asked the jury for $300 million in punitive damages. This amount was based on the harm to the public—the chronic-pain patients that were denied access to TENS devices. Thus, we think it clear the jury was requested to punish defendants for suppression, not for fraud. This argument was clearly prejudicial. Although the fraud may have been tangentially related to the suppression, damages for suppression were to be awarded by the jury under the antitrust claim. Our finding that these plaintiffs do not have standing to punish for antitrust violations merely enhances the prejudicial effect of the argument.

We therefore find the jury's $25 million punitive damages award to have been largely based upon plaintiffs' prejudicial and legally unfounded arguments. Moreover, the long trial (nearly six months) and the evidence relating to the entire antitrust claim created a prejudicial atmosphere that was compounded by plaintiffs' impermissible closing argument on punitive damages. This allowed the jury to punish the defendant as well for the antitrust violations.

In this regard, we vacate the award on punitive damages and remand to the district court for a new trial solely on the issue of punitive damages. We do not pass on the issue of whether, in the abstract, a $25

---

12. Plaintiffs' counsel also then instructed the jury that J & J's failure to send letters to the medical profession about the dangers of analgesic drugs was a basis for awarding punitive damages:

Well, the one that is the most disturbing, at least to me, is the seriousness and the degree of damage that the defendant's conduct caused to the general public, because since J & J is the only one in the position, the only drug company in the position that has something else [TENS], not only could they send a letter to the doctors, who they have this

fantastic contact with—we've been through the trade relations—but not only would they be able to say, 'Look, the drugs are no good for the chronic patient. They're no good. Don't use them. Don't fake these people out or let them believe that these pills are going to help them in the slightest'—not only could they have said that, but in the same letter they could say, "We have the answer."

Tr. 13,167–68. This argument had nothing to do with the misrepresentation concerning plaintiffs' earnout.

million punitive damages award may be excessive when based upon a $6 million fraud judgment.

We vacate the award of damages relating to the antitrust claim under §§ 1 and 2 of the Sherman Act with directions to dismiss plaintiffs' complaint with prejudice as to these claims for lack of standing to bring the suit.

We affirm the judgment on the verdict of $6.275 million for fraud; we vacate the judgment on the verdict of $25 million for punitive damages and remand to the district court for a new trial on punitive damages only.

Each party shall pay own costs.

HEANEY, Circuit Judge, concurring and dissenting.

I concur in the majority opinion only insofar as it sustains the jury verdicts for breach of contract and fraud. I would affirm the $25 million punitive damage award. I would moreover hold that the plaintiffs had standing to bring an action for antitrust violations and that while insufficient evidence was presented to find a violation of Section 2 of the Sherman Act, sufficient evidence was presented to permit the jury to find that the defendants had violated Section 1 of the Sherman Act under a rule of reason. I would remand to the district court for a new trial on the section 1 violation under a rule of reason standard.

### I.

### SECTION 1 OF THE SHERMAN ACT

#### A. *Standing*

The standing requirements are correctly set forth in the majority opinion. It is their application to this case that is questionable. In my view, the plaintiffs had standing to bring an action under Section 1 of the Sherman Act under the six standards of *Associated General Contractors of California v. California State Council of Carpenters,* —— U.S. ——, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

(1) There was a causal connection between the alleged antitrust violation and the harm to the plaintiffs. The violation consisted of J & J's suppression of the TENS device. The plaintiffs were harmed by this violation. Had J & J made the payments required by the contract, and suppressed the devices the plaintiffs could still recover for any injuries that the jury found to have occurred because of the suppression.

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), is not on point. The facts may be briefly stated: Brunswick, one of the nation's largest manufacturers of bowling equipment, acquired a number of defaulting bowling centers, some of which were in competition with the plaintiffs' recreation centers. Plaintiffs brought suit under Section 7 of the Clayton Act on the theory that, because of Brunswick's size, it had the capacity to drive smaller competitors out of the market. Plaintiffs claimed damages for the lost profits they would have made had Brunswick not acquired the defaulting centers and continued their operations. The jury returned a verdict for the plaintiffs. On appeal, the Third Circuit adopted the plaintiffs' legal theory, although remanding for a new trial. *NBO Industries Treadway, Cos. v. Brunswick Corp.,* 523 F.2d 262, 268–273 (3d Cir.1975). On petition for a writ of certiorari, a unanimous Supreme Court reversed. Justice Marshall, writing for the Court, observed that not only was the injury unrelated to the substantive basis for Brunswick's liability, but an award of damages based on such injury would be "inimical to the purposes" of the antitrust laws. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., supra,* 429 U.S. at 488, 97 S.Ct. at 697. The lost profits claimed by the *Brunswick* plaintiffs were profits they would have earned if the acquired bowling centers had been permitted to drop out of the market. "In other words, they were profits that would have been earned as the result of a reduction in competition." Note, *Antitrust Injury and Standing: A Question of Legal Cause,* 67 Minn.L.Rev. 1011, 1023 (1983).

In the instant case, plaintiffs claim an injury directly related to the substantive basis of J & J's antitrust liability. They claim the "profits" lost as a result of J & J's suppression of the TENS devices. They did

not seek to restrict competition or to withdraw from it; they sought rather to expand the competition. They sought to profit by having the TENS devices developed by a company with adequate capital and an in-place international distribution system. When J & J instead suppressed the TENS devices, both competition and the plaintiffs were harmed.

(2) J & J's motives were improper, *i.e.,* the suppression of the TENS devices to maximize their profits in prescription and nonprescription pain killers, and to retard the development of TENS devices in the pain killing industry.

(3) The injury was clearly of the type that Congress intended to protect against. Plaintiffs' injuries flowed from the anticompetitive aspects of J & J's acts. The fact that the anticompetitive acts were also breaches of contract and acts of fraud is immaterial.

(4) The anticompetitive injury to the plaintiffs flowed directly from J & J's suppression of the TENS devices.

(5) The damages are reasonably susceptible of measurement.

(6) There is little risk of duplicate recoveries. The district court should limit recovery to the larger of the verdicts recovered under the fraud plus punitive damages or the antitrust verdict trebled. Unless the plaintiffs are permitted to recover antitrust damages, the reality is that no one will have a sufficient stake to justify bringing an antitrust action and the practice of buying products or processes for the purpose of suppressing them will continue.

I have carefully read the cases cited by the majority for the proposition that a person who voluntarily withdraws from the market does not have standing to bring an antitrust action. In each of them the plaintiff intended to withdraw from the market. Here, the plaintiffs did not intend to withdraw. They intended to combine their knowledge, skills and resources with those of J & J and continue to participate in the market. Indeed, they believed that the product would be marketed vigorously and they would share along with the pain-rid-den in the benefits of that vigorous marketing.

In view of the fact that I would find that the plaintiffs had standing, it is necessary to discuss the remaining contentions raised by appellants.

### B. *The Section 1 Violation*

To establish a claim under Section 1 of the Sherman Act, a plaintiff must show (1) that two or more persons entered into a "contract, combination * * * or conspiracy," and (2) that it was in restraint of trade. *Oreck Corp. v. Whirlpool Corp.,* 639 F.2d 75, 78 (2d Cir.1980), *cert. denied,* 454 U.S. 1083, 102 S.Ct. 639, 70 L.Ed.2d 618 (1981). Here, the jury properly found and the district court properly held that the requisite concerted action was present. The court's reasons are set forth in detail in its post trial opinion and are fully supported in the record. First, J & J entered into a series of agreements with the subsidiaries Devices, PCD, and McNeil to suppress the TENS devices. *See Perma Life Mufflers, Inc. v. International Parts Co.,* 392 U.S. 134, 141–142, 88 S.Ct. 1981, 1985–86, 20 L.Ed.2d 982 (1968); *Kiefer-Stewart Co. v. Seagram & Sons,* 340 U.S. 211, 215, 71 S.Ct. 259, 261, 95 L.Ed. 219 (1951). Second, J & J used employment and noncompete agreements in tandem with the sales agreement. As for the "restraint of trade" element, section 1 clearly prohibits persons from engaging in acts to suppress or destroy a competitor in order to protect or enlarge their market position or to foreclose competition in a market. *See* 2 Von Kalinowski, Antitrust Laws and Trade Regulation § 6.01 (1982) (collected cases).

The key issue in this case, then, is whether plaintiffs' suppression claim should be analyzed under a *per se* or a rule of reason test. Under a *per se* approach, acts in restraint of trade, if proven, are conclusively presumed illegal without inquiry into the competitive harm they may have caused or the business reasons for their use. *Northern Pacific Railway Co. v. United States,* 356 U.S. 1, 5, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958). Under the rule of reason test,

the plaintiff must demonstrate that under "all the circumstances of a case * * * [the challenged practice] impos[es] an unreasonable restraint on competition." *Continental TV, Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977) (footnote omitted). Such unreasonableness is generally established by showing that the restraint has an adverse impact on competition which is not offset by other procompetitive consequences. *See Rosebrough Monument Co. v. Memorial Park Cemetery Association,* 666 F.2d 1130, 1138 (8th Cir.1981), *cert. denied,* 457 U.S. 1111, 102 S.Ct. 2915, 73 L.Ed.2d 1321 (1982). Plaintiffs' section 1 claim here was tried on a *per se* theory.

### 1. *Per Se Rule*

No case law or secondary authority recognizes a *per se* rule against suppression of competition of the kind the jury found to exist in this case. Plaintiffs rely on cases which state that it is *per se* illegal "to foreclose competitors from any substantial market." *E.g., United States v. Griffith,* 334 U.S. 100, 107, 68 S.Ct. 941, 945, 92 L.Ed. 1236 (1948); *International Salt Co. v. United States,* 332 U.S. 392, 396, 68 S.Ct. 12, 15, 92 L.Ed. 20 (1947). Although the "foreclos[ure]" language can be stretched to cover the facts here, the cases cited by plaintiff are distinguishable because they involve price fixing, tying arrangements, horizontal market divisions, and group boycotts—activities against which *per se* rules traditionally have been applied. *See* 2 Von Kalinowski, Antitrust Laws and Trade Regulation § 6.02 (1982).

Thus, the question becomes whether we should create a new *per se* category for intentional acts of suppression of the type found here. The Supreme Court has frequently cautioned that "[i]t is only after considerable business experience with certain business relationships that courts classify them as per se violations." *Broadcast Music, Inc. v. CBS,* 441 U.S. 1, 9, 99 S.Ct. 1551, 1557, 60 L.Ed.2d 1 (1979), *quoting United States v. Topco Associates,* 405 U.S. 596, 607–608, 92 S.Ct. 1126, 1133–1134, 31 L.Ed.2d 515 (1972). *See* 2 Von Kalinowski,

Antitrust Laws and Trade Regulation § 6.02 (1982).

Nonetheless, the Supreme Court has not held that the *per se* categories are limited to those listed above. It has stated the test for finding *per se* categories in various ways. In *Broadcast Music, Inc. v. CBS, supra,* 441 U.S. at 19–20, 99 S.Ct. at 1562–63, *quoting United States v. United States Gypsum Co.,* 438 U.S. 422, 441 n. 16, 98 S.Ct. 2864, 2875 n. 16, 57 L.Ed.2d 854 (1978), it said that the test for determining whether to apply a rule of *per se* illegality to a restraint of trade is "whether the practice facially appears to be one that would always or almost always tend to restrict competition and decrease output * * * or instead one designed to 'increase economic efficiency and render markets more, rather than less, competitive.'" In *Northern Pacific Railway Co. v. United States, supra,* 356 U.S. at 5, 78 S.Ct. at 518, it stated that to be illegal *per se* a practice must have a "pernicious effect on competition and lack any redeeming virtue."

In the light of these standards we should not consider the conduct of J & J in the present case a *per se* violation for the following reasons.

First, a *per se* rule against "suppression" of the kind of conduct involved here has no case law support. Nor are these acts of suppression closely analogous to any of the *per se* categories that courts previously have recognized. Moreover, the Supreme Court has advised courts to move cautiously in finding new *per se* offenses.

Second, plaintiffs' suppression theory is not well defined. Suppression is the essence of every violation of section 1, which prohibits concerted action "in *restraint* of trade." If we find that J & J's acts of suppression here constituted a *per se* section 1 violation, where should the line be drawn to determine which suppressive acts are *per se* illegal? Obviously not all combinations in restraint of trade are *per se* illegal. *Standard Oil Co. v. United States,* 221 U.S. 1, 63–70, 31 S.Ct. 502, 517–519, 55 L.Ed. 619 (1911).

The conduct involved here will not always be egregious. The act of purchasing a company for the purpose of suppressing it is indeed pernicious, and it is difficult to conceive of any benefit that could result from such an act. It is important to remember, however, that in this case, the use of the phrase "intentional suppression" is a shorthand way of saying that the jury inferred from circumstantial evidence—in essence J & J's failure to adequately fund and promote StimTech—that the defendant intended to suppress the TENS devices. A decision not to fully fund and promote a new product like TENS is not always bad for society. It may be bad because it is an intentional suppression of competition, or it may be a valid business decision because the product is not a worthwhile one.

Where, as here, the conduct that forms the basis of an alleged unlawful restraint of trade may be either good or bad for competition, depending on the particular factual setting, a *per se* rule against such conduct is inappropriate. This is particularly true since *per se* antitrust rules are intended to apply to categories of conduct, not single acts. *See Broadcast Music, Inc. v. CBS, supra,* 441 U.S. at 9, 99 S.Ct. at 1557.

Finally, this case is not a unique one because of J & J's size or market position. While J & J holds a dominant position in the market, it is not a monopolist. Discouraging all acquisitions does not promote competition. Individuals or small companies frequently are better innovators than large corporations, but they need the resources of a large corporation to market the product. An inappropriate *per se* rule here in order to punish J & J for intentionally suppressing plaintiffs' product may be more harmful to competition in the long run.

### 2. *Rule of Reason*

On the other hand, there is clearly sufficient evidence in the record to find a violation of Section 1 of the Sherman Act under a rule of reason, *e.g.:*

A. Prohibition of sales of TENS devices by StimTech in the United Kingdom and Europe, except through companies who had only one salesman and could not provide adequate sales coverage—December, 1974.

B. Refusal to permit StimTech to develop an improved TENS device—December, 1974.

C. Refusal to permit expansion of StimTech's United States business, and imposition of a "concentrated effort program" restricting StimTech's sales efforts to three or four already successful territories—January, 1975.

D. Refusal to permit StimTech to expand its successful and unique nurse liaison program for the sale of TENS devices—January, 1975.

E. Prohibition of construction of foreign factories and assembly plants for StimTech's products, known as "mini plants," useful to avoid tariff barriers, to receive favorable government treatment, and to reduce cost of production—January, 1975.

F. Continuing refusal to permit StimTech to engage in international marketing of the TENS devices, including entering a coercive arrangement with Devices prohibiting StimTech from selling in the United Kingdom and Europe, firing of international salesmen, failing to follow up on international sales leads, refusing to permit StimTech to establish its own distribution in Sweden in competition with Devices' distributor, and failing to use J & J international connections to assist StimTech.

G. Refusal in 1977 to accept large purchase orders for TENS devices from Pain Control Centers International.

H. Limiting and diluting StimTech's advertising campaign in 1977–1978. This advertising would have stressed the advantages of TENS devices over drugs used to kill pain.

I. Misappropriating StimTech's TENS electrode technology, refusing to assist StimTech in the development of a new TENS electrode, failing to supply StimTech with a TENS electrode developed by J & J's Patient Care Division for approximately three years, and attempting to coerce StimTech into price fixing and customer and market allocation agreements as a condition to supplying TENS electrodes to StimTech.

J. Withholding from StimTech a conductive adhesive gel for TENS electrodes developed by J & J's Patient Care Division.

K. Continuing refusal to permit StimTech to market its TENS devices in Japan or enter into licensing or other distribution arrangements with Japanese companies.

A jury could find from the evidence outlined above and similar evidence presented at trial that J & J's actions not only affected the market for TENS devices but that the actions were taken to protect J & J's stake in the over-the-counter and prescription analgesic drug markets. The TENS devices directly compete with analgesic drugs in virtually all areas of pain control. J & J is the dominant firm in both the prescription and over-the-counter analgesic markets, and its share in both these markets increased rapidly in recent years and continues to grow.

A defendant's intent in adopting a challenged practice is relevant to determining whether that practice is reasonable. *See Continental T.V., Inc. v. GTE Sylvania, Inc., supra,* 433 U.S. at 50 n. 15, 97 S.Ct. at 2557 n. 15; *Chicago Board of Trade v. United States,* 246 U.S. 231, 238, 38 S.Ct. 242, 244, 62 L.Ed. 683 (1918). Here, the jury found that J & J intentionally suppressed StimTech to prevent it from competing with J & J.

In sum, since it appears that there is sufficient evidence in the record to sustain a finding that J & J's actions were motivated by an anticompetitive intent and they had an anticompetitive impact, a jury might properly conclude that J & J's conduct constituted an unreasonable restraint of trade in violation of section 1. A remand for a jury determination on that issue is therefore appropriate. *See generally Applying the Rule of Reason: A Survey of Recent Cases and Comment,* 18 San Diego L. Rev. 335 (1980).

## II.

### SECTION 2 OF THE SHERMAN ACT

To establish a claim of attempt to monopolize the plaintiffs were required to prove (1) a relevant market, (2) a specific intent to obtain a monopoly within that market, (3) steps to obtain monopoly power, and (4) a dangerous probability of success in obtaining a monopoly. *United States v. Empire Gas Corp.,* 537 F.2d 296, 298–307 (8th Cir.1976), *cert. denied,* 429 U.S. 1122, 97 S.Ct. 1158, 51 L.Ed.2d 572 (1977). Here, plaintiffs did not, as a matter of law, prove a dangerous probability of success in any of the four markets considered by the jury below. J & J's share in any of the relevant markets was significantly less than that required to indicate a dangerous probability of success.

## III.

### PUNITIVE DAMAGES

In my view, the jury was correctly instructed as to punitive damages and that award should be permitted to stand. The fraud on the part of J & J was entering into the agreement with plaintiffs with the intent to suppress the TENS devices. J & J's conduct was a breach of contract, an act of fraud, and an act of suppression prohibited by the Sherman Act. If J & J had not acted out their intent to suppress, there would be no damages. But, they acted on their intent and the plaintiffs and the public were harmed. As one authority has noted, "[I]t is not so much the particular tort committed as the defendant's motives and conduct in committing it which will be important as the basis of the award [of punitive damages]." W. Prosser, Law of Torts § 2, at 11 (4th ed. 1971) (footnote omitted). The plaintiffs should be able to recover punitive damages to deter J & J or any other company from engaging in similar intentional conduct in the future. *See City of Newport v. Fact Concerts, Inc.,* 453 U.S. 247, 266–267, 101 S.Ct. 2748, 2759–2760, 69 L.Ed.2d 616 (1981); *Nye v. Blyth Eastman Dillion & Co.,* 588 F.2d 1189, 1200 (8th Cir.1978).

The majority correctly notes that treble damages in an antitrust action embodies both punitive and compensatory elements. Thus, the plaintiffs' recovery would in any event be limited to the larger of the sums allowed for the antitrust violation or the fraud claim with punitive damages. No duplicative damages would be permitted.

## IV.

## CONCLUSION

We cannot continue to dilute our antitrust laws. They should be vigorously enforced to insure a competitive economy in which new products are freely and fully developed. While we should not discourage large companies from acquiring smaller ones for the purpose of developing the products of the smaller company, we cannot permit a company that is dominant in a relevant market to acquire a smaller company that has perfected a competing product with an intent to suppress that product and then carry out that intent. Such conduct is clearly in violation of the antitrust laws. If the seller makes the sale with knowledge of the intended suppression or without regard to whether the product will be developed, he or she obviously does not have standing to bring an action for the antitrust violation. But if the sale is made with the understanding that the product will be freely and fully developed and that the seller will participate in the benefits of the development, he or she has standing. Unless we so hold, the probabilities are that the conduct will go unpunished.

### On Petition for Rehearing En Banc

LAY, Chief Judge.

No active judge has filed a request for a rehearing en banc; therefore, pursuant to Fed.R.App.P. 35, the petition for rehearing en banc is denied.

### On Petition for Rehearing

Both sides have filed petitions for rehearing. Upon consideration, we adhere to our original opinion insofar as plaintiffs' petition for rehearing sought modification of the denial of plaintiffs' antitrust standing and punitive damages award. However, we grant Johnson & Johnson's (J & J) petition for rehearing and vacate the fraud judgment with remand for a new trial for the reasons stated below.

*The Fraud Claim*

 In our original opinion we affirmed the fraud count but granted a new trial on the punitive damages awarded under the fraud recovery. We now agree with J & J that we have severed issues that are effectively intertwined. As J & J points out, we have previously refused to grant a new trial solely on punitive damages. In *Nodak Oil Co. v. Mobil Oil Corp.,* 533 F.2d 401, 411 (8th Cir.1976), for example, we refused to require the district court to grant a new trial only on punitive damages when the punitive damages were held excessive. Instead, we required a new trial on both issues of liability and damages since the issue of punitive damages was so interwoven with the substantive merits of the fraud count. *See also Slater v. KFC Corp.,* 621 F.2d 932, 938 (8th Cir.1980) ("we conclude that the issues of damages and liability in this case are so interwoven as to require a new trial on both"); *Stanger v. Gordon,* 309 Minn. 215, 244 N.W.2d 628, 632 (1976) ("we regard a retrial limited to the issue of punitive damages as impractical"). We find these cases controlling.

Moreover, in *Gasoline Products Co. v. Champlin Refining Co.,* 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1931), the Supreme Court stated:

> Where the practice permits a partial new trial, it may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.... Here the question of damages on the counterclaim is so interwoven with that of liability that the former cannot be submitted to the jury independently of the latter without confusion and uncertainty, which would amount to a denial of a fair trial.

*Id.* at 500, 51 S.Ct. at 515 (citations omitted).[1]

---

1. A further question raised is whether this is "one of those exceptional cases in which justice would be served by sustaining the actual damage award upon condition that plaintiff elects to file remittitur of all exemplary damages." *Bankers Life & Casualty Co. v. Kirtley,* 307 F.2d 418, 426 (8th Cir.1962). We think it is

not. In *Bankers Life* the exemplary damages award was found excessive merely because of the size. There was no affirmative evidence of passion or prejudice on the part of the jury other than the size of the award, a factor the court took care to note. Here, however, we

We therefore vacate the entire judgment for fraud and remand for a new trial on liability and damages, both actual and punitive.

### Breach of Contract

In our original opinion we did not address plaintiffs' alternative recovery of $5.7 million for breach of contract because we affirmed the $6.275 million fraud judgment. However, in view of the above ruling, we now address the breach of contract judgment.

J & J challenges plaintiffs' recovery for breach of contract on the grounds that a breach was not proven and that parol evidence was impermissibly submitted to the jury. Our analysis causes us to disagree with both contentions. The district court recited ample evidence for the jury to find a breach of contract. *See McDonald v. Johnson & Johnson,* 537 F.Supp. 1282, 1349–50 (D.Minn.1982). Our reading of the record confirms this. The plaintiffs' claim relating to the contract breach centers on paragraph 10(a). This paragraph provides:

> Stockholders [plaintiffs] and Johnson & Johnson recognize and acknowledge that the relationship which will exist between Johnson & Johnson, the Company [Stim-Tech] and the Stockholders upon consummation of the transactions contemplated herein, must be based on a high degree of mutual trust and confidence by the Company, Stockholders and Johnson & Johnson. Stockholders and Johnson & Johnson agree that each will at all times act in respect to its dealings with the Company and its operations, and subject to its dealings with the Company and its operations, and subject to the exercise of reasonable business judgment, act [sic] in such a way as to promote to the extent reasonably possible the successful operation and growth of the Company.

Both parties agree that to prove a breach of this paragraph requires a showing of bad faith. As the district court set forth, the facts relating to J & J's actions subsequent to the 1974 contract could reasonably be construed by the jury to have been taken consciously and in bad faith. *See id.* at 1349.

We also find that parol evidence was properly admitted to explain the circumstances surrounding the execution of the written contract in an effort to derive the appropriate meaning of the general contract language. *See id.* at 1348. This is in accord with Minnesota law. *See Anderson v. Kammeier,* 262 N.W.2d 366, 370 n. 2 (Minn.1977). Additionally, this court has recognized that facial ambiguity is not a prerequisite to the use of parol evidence to aid in contract interpretation under Minnesota law. *Telex Corp. v. Balch,* 382 F.2d 211, 217 (8th Cir.1967). Therefore, plaintiffs were entitled to show statements made by J & J during the contract negotiations.

We therefore affirm the $5.7 million judgment on the breach of contract count. We vacate and remand the judgment on the fraud and punitive damages count; in doing so, we make it clear that any recovery in the new trial for fraud in terms of compensatory damages must be discounted by the breach of contract damage award.

HEANEY, Circuit Judge, concurring and dissenting.

I concur in the modification of the Court's earlier decision insofar as it sustains the jury verdict for breach of contract. I adhere to my previous opinions that the case should be remanded to permit the jury to determine the plaintiffs' claim under Section 1 of the Sherman Act using a rule of reason test, and that the fraud and punitive damages award should be affirmed.

found that the punitive damages award was influenced by prejudicial statements in the closing argument. We therefore find that a remittitur is not proper.