Robert B. TURNER, Michael M. Gray and Gordon P. Ramsey, As Trustees of the AMEC Liquidating Trust, and Robert B. Turner, Plaintiffs,

v.

JOHNSON & JOHNSON, Arbrook, Inc., Charles M. Hartman, Gene E. Hollen, and Thomas E. Taylor, Defendants.

Civ. A. No. 79–2259–MC.

United States District Court, D. Massachusetts.

Oct. 22, 1982.

Joseph S. Iandiorio, Waltham, Mass., Daniel R. Shulman, Gray, Plant, Mooty, Mooty & Bennett, Minneapolis, Minn., Joseph M. Alioto, San Francisco, Cal., Jerry Cohen, Glass, Brooks & Cohen, Boston, Mass., for plaintiffs.

Frederick T. Davis, Patterson, Belknap, Webb & Tyler, New York City, Herbert Weissblum, Riemer & Braunstein, Boston, Mass., for defendants.

## MEMORANDUM AND ORDER

McNAUGHT, District Judge.

This action came on to be heard on the defendants' motion for summary judgment under Fed.R.Civ.P. 56. Among the voluminous materials submitted to and considered by this court are the pleadings, including several appendices and over a thousand exhibits, affidavits in support of and in opposition to the motion, answers to interrogatories of the plaintiffs and the defendants, and over twenty depositions. After consideration of the foregoing material and consistent with the discussion which follows, I find that the plaintiffs lack standing to bring their antitrust claims, and, therefore, I will allow the defendants' motion as it relates to those claims; the motion is denied as to the plaintiffs' fraud claim and their claim under M.G.L. c. 93A.

### I.

The plaintiffs are the trustees of the AMEC Liquidating Trust, the successor in interest to American Medical Electronics Corporation (AMEC), which was incorporated in August of 1972. Plaintiff Robert B. Turner was the President and founder of AMEC and inventor of its line of electronic thermometers. From mid-1973 until the sale of its assets to Johnson and Johnson (J & J) on June 17, 1976, AMEC manufactured, developed, and marketed an electronic thermometer known as Meditemp.

J & J makes and sells products in many areas of the health care field and functions through wholly-owned subsidiaries and operating divisions. The defendant Arbrook, Inc. was one of those subsidiaries. The defendants Charles M. Hartman and Gene E. Hollen were, respectively, New Products Manager and Vice President and General Manager of the Patient Care Division (PCD) of J & J Products, Inc., another J & J subsidiary. Defendant Thomas E. Taylor was President of Arbrook until 1979.

In their complaint, the plaintiffs allege that, through fraud and misrepresentation, J & J acquired the assets of AMEC for the purpose of suppressing it and eliminating competition between AMEC's Meditemp thermometer and J & J's Survalent thermometer, which was to be marketed by Arbrook. In addition to the allegations of fraud and deceit, the plaintiffs charge that the defendants' actions violate §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2; § 7 of the Clayton Act, 15 U.S.C. § 18; and M.G.L. c. 93A, § 2. Jurisdiction is alleged under §§ 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, and under 28 U.S.C. § 1332.

### II.

In 1975, AMEC and J & J, through its PCD, began negotiating for the sale of AMEC's assets to J & J. Plaintiffs allege that in the course of those negotiations J & J made representations, which plaintiffs later discovered to be false, concerning

1) what J & J could and would do to promote the development and sale of Meditemp;

2) the nature and extent of J & J's interest in the electronic thermometer being developed by Arbrook;

3) the type of thermometer being developed by Arbrook; and

4) J & J's policies regarding royalties from international sales.

Plaintiffs also allege that confidential information regarding AMEC's patents was disclosed to PCD during the negotiations

and that that information was passed on to Arbrook. According to plaintiffs, at J & J's insistence Patent Technology Incorporated (PTI), with whom Arbrook had entered into an agreement by which it had an option to purchase all of PTI's electronic thermometers and its patents, provoked a patent interference proceeding to determine the validity of the AMEC and PTI patents. The purpose of the interference proceeding, say the plaintiffs, was to create a question concerning the validity of the AMEC patent and to place AMEC in a difficult position if negotiations with J & J fell through.

Plaintiffs further allege that after it acquired AMEC, J & J proceeded to suppress Meditemp by refusing to provide sufficient funding, manpower, or equipment to develop and market successfully the Meditemp thermometer.

In late 1977, J & J, through Arbrook, exercised its option on the PTI thermometer and patents. By November, 1979, Arbrook had decided to drop Survalent. In October of 1980, PTI repurchased its Survalent thermometer from J & J.

On November 13, 1979, the date on which plaintiffs commenced this lawsuit, J & J decided to discontinue Meditemp. Plaintiffs allege that contrary to the written agreement between the parties, J & J never returned the Meditemp business to AMEC and eventually buried the business in the Randolph town dump.

## III.

Defendants have moved for summary judgment contending 1) that plaintiffs lack standing to pursue their antitrust claims, 2) that plaintiffs have not alleged, nor can they prove, violations of antitrust laws, 3) that plaintiffs' allegations of fraud are doomed under the parol evidence rule and principles of contract law, and 4) that plaintiffs' claim under M.G.L. c. 93A must fail because J & J is exempt from application of that chapter. The discussion which follows will address each of those points in that order.

A) *Plaintiffs' Standing to Bring Antitrust Claims.*

The defendants argue that since plaintiffs transferred their assets to J & J, they lack standing to complain of antitrust violations in the market from which they withdrew.

Analysis of plaintiffs' standing must begin with the most recent Supreme Court decision dealing with the issue of standing under § 4 of the Clayton Act, *Blue Shield of Virginia v. McCready,* —— U.S. ——, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982). There, McCready, a subscriber to a health plan provided by Blue Shield of Virginia, had alleged that Blue Shield's failure to reimburse her for psychotherapy performed by a psychologist, while granting reimbursement for treatment by psychiatrists, was part of a conspiracy in restraint of competition in the psychotherapy market. The Court held that, "[a]s a consumer of psychotherapy services entitled to financial benefits under the Blue Shield plan, we think it clear that McCready was 'within that area of the economy . . . endangered by [that] breakdown of competitive conditions' resulting from Blue Shield's selective refusal to reimburse." *Id.* at ——, 102 S.Ct. at 2549 (quoting *Multidistrict Vehicle Air Pollution M.D.L. No. 31,* 481 F.2d 122, 129 (9th Cir.1973).

In upholding standing on the part of *McCready,* the Court found that "the injury she suffered was inextricably intertwined with the injury the conspirators sought to inflict on psychologists and the psychotherapy market." *Id.* The Court distinguished its earlier holding in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,* 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977), but reemphasized the requirement announced in that case that the injury alleged by a plaintiff in an antitrust case must "[flow] from that which makes defendants' acts unlawful." *Id.* at 489, 97 S.Ct. at 697. Under the facts of *McCready,* the Court found that McCready's injury was an inevitable result of the defendants' scheme to restrain competition in the psychotherapy market.

Such is not the situation in the case now before this court. The sale of AMEC's assets to J & J effectively removed AMEC from the marketplace. Notwithstanding plaintiffs' characterization to the contrary, after its sale to J & J, AMEC was no longer in the electronic temperature taking market. The plaintiffs allege that the defendants committed fraud and misrepresentation to gain control of AMEC and to further the goal of eliminating AMEC as a competitor. As was stated by the First Circuit in *A.D.M. Corp. v. Sigma Instruments, Inc.*, 628 F.2d 753, 754 (1st Cir.1980),

> While it is not inconceivable that "mere" unfair business practices, or business torts, could in the proper situation constitute an antitrust violation, *see George R. Whitten, Jr., Inc. v. Paddock Pool Builders, Inc.*, 508 F.2d 547 (1st Cir.1974), *cert. denied*, 421 U.S. 1004 [95 S.Ct. 2407, 44 L.Ed.2d 673] ..., the transmutation of these state law torts into federal antitrust violations would have to be based upon a finding that the injuries for which compensation is sought have an unreasonable effect on competition, as well as on a particular competitor.

Any injury which AMEC suffered was due to the alleged business torts and the fraud on the part of J & J and not to any anticompetitive effect of the acquisition. "If the sale of [AMEC's] assets had an effect on competition, it would have occurred whether or not [AMEC] was harmed. There is thus lacking the essential connection between injury and the aims of the antitrust laws necessary to give [AMEC] standing." *Id.* It was not the fact of AMEC's elimination as a competitor which caused its alleged injury; rather the injury resulted from the fraud and misrepresentation allegedly practiced by J & J during the negotiations and the acquisition.

■ Plaintiffs' injuries, therefore, do not "flow from that which makes defendants' acts unlawful," *Brunswick*, 429 U.S. at 489, 97 S.Ct. at 697, and plaintiffs lack standing under §§ 4 or 16 of the Clayton Act to bring their antitrust claims.

**B)** *Fraud Claim.*

Plaintiffs allege that defendants made a number of statements during negotiation which were material and upon which AMEC relied in entering into the agreements with J & J. Paragraph 22 of the plaintiffs' first amended and supplemental complaint lists those alleged misrepresentations:

22. In the course of the negotiations between the parties and in connection with the execution of the option and acquisition agreements described above, J & J made the following representations, statements, and undertakings to AMEC:

a. That J & J was an honest and trustworthy company, and that AMEC could rely upon the truth of all promises and representations made to it by J & J.

b. That J & J would be the best health products marketing organization to promote fully the development and sale of the Meditemp thermometer, including normal and anticipated improvements, and would in fact devote its full efforts, expertise, and resources to promoting the development and sale of the Meditemp thermometer, including normal and anticipated improvements.

c. That, in addition to generally providing full management, financial, and marketing support for the Meditemp thermometer, defendants would specifically market the Meditemp thermometer as part of a "menu" or "Fuller brush" approach, whereby said thermometer would be one of the many items J & J salesmen routinely offered to their customers; and would educate doctors and other health care professionals in the use, properties, and advantages of the Meditemp thermometers.

d. That neither J & J nor any of its subsidiaries had any actual potential interest in any other electronic thermometer, except for the option of Arbrook to acquire an "Ivac type" thermometer.

e. That AMEC did not need to worry about Arbrook's option to acquire another electronic thermometer, which was an "Ivac type" thermometer.

f. That J & J could not grant AMEC a right to receive installment payments based on any foreign sales of probe covers, because of a corporate J & J policy prohibiting any J & J subsidiary in the United States from agreeing to any royalty payments to inventors based upon sales by any international affiliate or subsidiary of J & J.

The defendants argue that they are entitled to summary judgment on the fraud claim since 1) the oral statements upon which the plaintiffs base their claim were the subject of negotiation and were resolved in Sections 12.1 and 12.2 of the agreement, and 2) many of the statements consist of opinion or promises of future conduct.

■ Ordinarily, where a written agreement contains unambiguous, precise language, the parol evidence rule bars the consideration of any extrinsic evidence of prior or contemporaneous representations, oral or written, to vary or alter the terms of that written agreement. Where such evidence is offered to show fraud or misrepresentation, however, the parol evidence rule does not apply. *New England Foundation Co. v. Elliot A. Watrous, Inc.*, 306 Mass. 177, 27 N.E.2d 756 (1940); *Sandler v. Elliott*, 335 Mass. 576, 141 N.E.2d 367 (1957). Since plaintiffs are asserting that they were fraudulently induced into signing the agreement, they are not barred by the parol evidence rule from pursuing that claim.

■ Defendants' second contention is that many of the statements upon which plaintiffs claim reliance were promissory in nature and, therefore, not actionable. While that is the general rule, *see, e.g., Pepsi-Cola Metropolitan Bottling Co. v. Pleasure Island, Inc.*, 345 F.2d 617 (1st Cir. 1965); *Saxon Theatre Corp. of Boston v. Sage*, 347 Mass. 662, 200 N.E.2d 241 (1964), there is an exception for those cases where, at the time the promise was made, the promisor had no intention of carrying it out. *Barrett Associates, Inc. v. Aronson*, 346 Mass. 150, 190 N.E.2d 867 (1963).

■ The alleged statements that J & J was honest and trustworthy (Complaint, ¶ 22(a)) and that J & J was the "best health products marketing organization to promote fully the development and sale of the Meditemp thermometer . . ." (Complaint, ¶ 22(b)), are akin to seller's talk or "puffing". That type of representation is not actionable since plaintiffs would not be justified in placing reliance upon it.

■ The alleged representations regarding what J & J would do to develop and market Meditemp are promissory in nature. Plaintiffs claim, however, that those representations were false at the time they were made and that J & J's intention was to suppress Meditemp. Defendants, of course, deny ever making any representations as to what they could or would do for Meditemp. The dispute over whether or not the representations were made is an issue of fact which must be resolved by the trier-of-fact. Another factual issue is whether or not the defendants knew that the representations were false and misleading at the time they were made.

The remaining statements which plaintiffs claim were fraudulent (Sections (d), (e) and (f) of ¶ 22) are statements of existing facts which may be the subject of an action for fraud. Plaintiffs' allegations concerning these statements raise genuine issues of fact similar to those raised by the promissory statements mentioned in the previous paragraph.

The defendants argue that plaintiffs had a duty to investigate defendants' claim that the Survalent thermometer was an "IVAC-type" and that plaintiffs had nothing to worry about. Whether or not the plaintiffs acted reasonably in relying on the statements of the defendants is another issue to be determined by the trier-of-fact.

For these reasons, I decline to grant summary judgment on the plaintiffs' fraud claim.

### C) *Claim under M.G.L. c. 93A.*

Defendants argue that they are exempt from suit under M.G.L. c. 93A by § 3(1)(b) which states, in pertinent part:

§ 3. Exempted transactions

(1) Nothing in this chapter shall apply to

(b) trade or commerce of any person of whose gross revenue at least twenty per cent is derived from transactions in interstate commerce, excepting however transactions and actions which (i) occur primarily and substantially within the commonwealth, and ...

Plaintiffs concede that J & J's gross revenue is derived almost entirely from transactions in interstate commerce. They contend, however, that they are challenging actions of the defendants which occurred primarily and substantially in Massachusetts.

The burden of establishing exemptions from the provisions of M.G.L. c. 93A is on the person claiming the exemption. *Slaney v. Westwood Auto, Inc.,* 366 Mass. 688, 322 N.E.2d 768 (1975). Defendants have not met that burden. Although the plaintiffs have alleged a conspiracy in an attempt to monopolize and in restraint of trade in the electronic temperature taking market, the acts of which plaintiffs complain, i.e., fraud, misrepresentation, and suppression, appear to have taken place primarily in Massachusetts.

I, therefore, will deny defendants' motion for summary judgment on the plaintiffs' claim under M.G.L. c. 93A without prejudice to its renewal at another time.

IV.

For these reasons, the defendants' motion for summary judgment is allowed in part and denied in part consistent with the foregoing discussion.