**BRYANT HEATING AND AIR CONDITIONING CORP., INC., Plaintiff,**

v.

**CARRIER CORPORATION, et al., Defendants.**

**No. 80–509–CIV–KING.**

United States District Court,
S.D. Florida.

Nov. 1, 1984.

Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin, P.A. by Joel S. Perwin and John Oster, Miami, Fla., for plaintiff.

Morgan, Lewis & Bockius by Lowell Garrett, Squire, Saunders & Dempsey by Philip L. O'Neill, Miami, Fla., for defendants.

ORDER GRANTING PARTIAL JUDGMENT ON THE PLEADINGS AS TO COUNTS I, IV, V, VI, VII, VIII, XVII and XVIII; ORDER GRANTING SUMMARY JUDGMENT AS TO COUNTS II and III

JAMES LAWRENCE KING, Chief Judge.

This cause arises before the Court upon defendants' joint motion for partial judgment on the pleadings or, in the alternative, for summary judgment.

On February 27, 1980, plaintiff, an independent distributor of defendant CARRI-ER CORPORATION, filed suit against its manufacturer CARRIER CORPORATION; CARRIER's wholly owned finance subsidiary CARRIER DISTRIBUTION CREDIT CORPORATION (CDCC); and individual defendants MELVIN C. HOLM, JOSEPH HOFF, RICHARD E. WEINBERG and ALBION W. FRAZIER, all officers and/or management personnel of CARRIER and/or its BDP company division, alleging violations of sections 1 and 2 of the Sherman Act, section 7 of the Clayton Act, and alleging additional claims based upon state statutory, contract, tort and civil conspiracy grounds.

The gist of plaintiff's claims originates in CARRIER's 1978 termination .of plaintiff as a distributor of its Bryant line of heating and air conditioning equipment and its replacement of plaintiff with a company owned factory branch. Plaintiff alleges that this termination and takeover was the culmination of an overall anticompetitive effort on the part of defendants to put its independent distributors, such as plaintiff, out of business.

Defendants' motion requests judgment on ten of the eighteen counts of plaintiff's complaint, including all eight of the antitrust counts, based upon the following arguments:

1. Defendants are entitled to judgment on the pleadings as a matter of law for all six of the plaintiff's conspiracy claims under section 1 of the Sherman Act, Counts I, II, III, V, VII and VIII, for plaintiff's failure to identify the requisite plurality of actors.

2. Defendants are entitled to judgment on the pleadings as a matter of law for the plaintiff's claims under section 2 of the Sherman Act, Count IV, and section 7 of the Clayton Act, Count VI, as the plaintiff lacks standing to assert these claims because it has not suffered an "antitrust injury".

3. As an alternative basis for judgment on plaintiff's claim under section 2 of the Sherman Act, Count IV, defend-

ants are entitled to summary judgment as the defendant CARRIER CORPORATION lacks the requisite degree of market power to sustain a monopolization or attempted monopolization claim.

4. Defendants are entitled to judgment on the pleadings as a matter of law for plaintiff's claim under the Florida Deceptive and Unfair Trade Practices Act, Count XVII, as the plaintiff lacks standing to assert this claim because it has prior experience in the business.

5. Defendants are entitled to judgment on the pleadings as a matter of law for plaintiff's claim for wrongful conspiracy under Florida law, Count XVIII, for plaintiff's failure to identify the requisite plurality of actors.

The discussion which follows will address each of defendants' arguments in the above stated order.

### 1. Conspiracy Counts I–VIII under section 1 of the Sherman Act

■ Defendants' first argument is predicated upon the recent Supreme Court opinion in *Copperweld Corp. v. Independence Tube Corp.*, —— U.S. ——, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984), which changed the law applicable to plaintiff's six conspiracy claims under section 1 of the Sherman Act. Section 1 explicitly prohibits any "contract, combination ... or conspiracy" that unreasonably restrains trade, 15 U.S.C. § 1 (1982). Thus, in order to state a claim under section 1 it is necessary to challenge concerted action by a plurality of actors. *Monsanto Co. v. Spray-Rite Service Corp.*, —— U.S. ——, ——, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). In June of 1984, the Supreme Court held in *Copperweld* that, for the purposes of section 1 of the Sherman Act, a corporation and its wholly owned subsidiary or division cannot, as a matter of law, form the plurality of actors required by section 1. *Copperweld*, —— U.S. at ——, 104 S.Ct. at 2746. Accordingly, defendants contend that, after *Copperweld*, all the plaintiff's section 1 counts

alleging an intra-corporate or "horizontal" conspiracy in restraint of trade must be dismissed as they clearly fail to state a claim under section 1 of the Sherman Act, and the plaintiff concedes as much.

■ Three of the plaintiff's section 1 counts, (Count I, antitrust conspiracy; Counts V and VII, relating to customer and/or pricing restrictions), specifically challenge concerted action by defendants CARRIER, and its wholly owned subsidiary CDCC. As to these three counts, therefore, the Court finds that, pursuant to *Copperweld*, the defendants are entitled to dismissal as a matter of law.

■ Plaintiff's Count VIII, refusal to deal, fails to even satisfy the threshold pleading requirement of alleging a plurality of actors, alleging instead a unilateral refusal to deal by defendant CARRIER which is not violative of section 1. Therefore, as to this count also the Court finds that defendants are entitled to dismissal as a matter of law.

Defendants argue that the plaintiff's remaining two section 1 counts (Counts II and III, relating to defendants' sales allowance program) are subject to the same deficiency as Count VIII above, as they similarly fail to satisfy the threshold pleading requirement of alleging concerted action by a plurality of actors. Counts II and III allege instead that the "rebate plan", defendants' sales allowance program, violates section 1 in that it operates, respectively, as an "unreasonable restraint of trade", a rule of reason offense, and "as an illegal price maintenance and/or price-fixing scheme", a per se offense. Moreover, defendants further argue that, notwithstanding the fact that neither count identifies the requisite plurality of actors, both parties throughout the four and one half years of this litigation have viewed the unspecified conspirators in these counts to be defendants CARRIER and CDCC. Thus, these counts would also be subject to dismissal pursuant to *Copperweld*.

Plaintiff, however, disputes defendants' assertion that the only conspiracy chal-

lenged or inherent in the complaint is the now discredited "horizontal" or intra-corporate one involving defendants CARRIER and CDCC. As regards Counts II and III, plaintiff contends that the unspecified conspirators, in the alleged resale pricefixing scheme, are itself and defendant CARRIER, operating primarily through its BDP company division, and that the relationship between them is a combination cognizable under section 1. Specifically, plaintiff argues in its response that the allegations in its complaint, at paragraphs 20 and 21, and the facts, as developed in the depositions, affidavits and documents of the appendix attached to its response, both support a "vertical coerced conspiracy" theory between defendant CARRIER and its unwilling distributors, including plaintiff, to set resale prices in violation of section 1. See *Greene v. General Foods Corp.*, 517 F.2d 635, 645 (5th Cir.1975) (independent distributor held not estopped to bring section 1, Sherman Act suit alleging vertical resale pricefixing scheme as record showed plaintiff was coerced by defendant manufacturer into participating in scheme). In essence, according to plaintiff, defendant CARRIER by way of its sales allowance program imposed upon plaintiff "a vertical contract or combination which had the clear effect of constraining price competition at the wholesale level."

While defendants concede that a "vertical coerced conspiracy" is an established theory of liability under section 1, they argue, nevertheless, that such a theory is neither alleged or inherent in the complaint. They further argue that even assuming a theory of vertical price fixing is sufficiently alleged in the complaint, they would still be entitled to dismissal of Counts II and III on the basis of summary judgment. In effect, defendants in their reply invite the Court to convert their motion for judgment on the pleadings, pursuant to Rule 12(c), Federal Rules of Civil Procedure, into a motion for summary judgment by reviewing all the plaintiff's evidence concerning the alleged illegality of defendants' sales allowance program.

At the outset, the Court notes that it is not unmindful that under the liberal federal rules concept of "notice pleading", a complaint is sufficient if the facts state a claim under any conceivable legal theory. See *Thompson v. Allstate Insurance Co.*, 476 F.2d 746, 749 (5th Cir. 1973). As the Supreme Court has stated, the theory of notice pleading is satisfied as long as the pleadings "give the defendant fair notice of what the plaintiffs claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957). Moreover, as this Court recognized in *City of Gainesville v. Florida Power and Light Company*, 488 F.Supp. 1258, 1263 (S.D.Fla.1980), "the concept of notice pleading applies to the 'big' antitrust case as well as the 'small' negligence lawsuit." Paragraphs 20 and 21 of plaintiff's complaint, contain specific and detailed factual allegations that the rebate plan, or sales allowance program, that defendant CARRIER imposed upon plaintiff resulted in an illegal resale price maintenance scheme. To this extent, therefore, the Court agrees with plaintiff that its complaint fairly alleges a vertical coerced conspiracy to maintain resale prices, thus defeating a motion for judgment on the pleadings. Accordingly, the discussion which follows will consider defendants' alternative basis for dismissal of Counts II and III, namely summary judgment, on the grounds that all the evidence presented demonstrates that defendants' sales allowance program does not constitute resale price maintenance.

As plaintiff reminds this Court, the Supreme Court in *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962) noted that as a general rule summary judgment is disfavored in complex antitrust litigation because motive and intent are so important. However, this Court is of the view that summary judgment is proper on the record of the instant case. Assuming for the purposes of this motion that all evidence presented by plaintiff concerning the sales allowance program is true, and viewing this evidence and the inferences that

can be drawn therefrom in the light most favorable to plaintiff, defendants are still entitled to prevail as a matter of law. See Fed.R.Civ.P. 56(c).

It is well established that vertical price maintenance or price-fixing agreements are per se violations of section 1 of the Sherman Act. See *Monsanto Co. v. Spray-Rite Service Corp.*, — U.S. —, —, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). In order for there to be resale price maintenance, the manufacturer must announce, in advance, a resale price to its distributor and then take "affirmative, action" to force its distributor to comply with the resale price. *United States v. Parke, Davis & Co.*, 362 U.S. 29, 45–47, 80 S.Ct. 503, 512–13, 4 L.Ed.2d 505 (1960). As plaintiff concedes, it must show some affirmative conduct by the defendants which interferes with its free pricing decisions as: "The crux of any price-fixing agreement is the relinquishment by the trader . . . of the freedom to set prices in accordance with its own judgment." *Chisholm Brothers Farm Equipment Co. v. International Harvester Co.*, 498 F.2d 1137, 1142 (9th Cir.1974).

In the sales allowance program in question, however, it is the distributors, such as plaintiff, and not the defendant manufacturer CARRIER, who suggest the resale price. The depositions of Richard Legg, at pages 22–30, and Joseph Hoff, at page 51, which are included in the appendix of documents to plaintiff's response, clearly indicate that the defendants' sales allowance program is initiated at the discretion of its distributors. The distributors initiate the program as a result of their unilateral determinations regarding their resale prices.

Defendants' program, as these affidavits illustrate, is essentially one in which it agrees to reduce its wholesale price to its distributors in order to enable them to meet price competition. Any distributor who approaches defendant manufacturer with a request for a lower wholesale price is required to provide proof that a lower wholesale is indeed necessary to meet a specific competitive situation. A further aspect of the sales allowance program is that if it is later learned that the distributor has resold above the price it originally represented as necessary to meet competition, then defendant manufacturer will disallow that previously granted price discount. This is a policy, defendants maintain, which is designed to insure that its distributors actually pass the discounts on to their customers.

The Court agrees with defendants that a series of recent Court of Appeals decisions are dispositive on the question of the legality of its sales allowance program, as described above. These decisions hold that price assistance programs, such as the defendants', do not constitute resale price maintenance violative of section 1, as they are essentially pro-competitive, allowing distributors to engage in price competition, rather than anticompetitive. See *AAA Liquors, Inc. v. Joseph E. Seagram & Sons, Inc.*, 705 F.2d 1203, 1206–1208 (10th Cir. 1982); *Lewis Service Center, Inc. v. Mack Trucks, Inc.*, 714 F.2d 842, 846–847 (8th Cir.1983); *Jack Walters & Sons Corp. v. Morton Building, Inc.*, 737 F.2d 698, 706–708 (7th Cir.1984).

The Court notes that plaintiff disputes the crucial point that defendants' sales allowance program was initiated by its distributors. As it argued at the oral hearing on defendants' motion:

In this case, the manufacturer structured the program to impose the price upon the dealer, to require the dealer to beg for the rebate because the price was set artificially at a level that was beyond the level at which the dealer could make a profit, could even sell the thing. It was set artificially at a completely anticompetitive level.

This argument is identical, however, to one rejected by the Court in the *Lewis* case. *Lewis* involved a section 1 challenge to a manufacturer's "sales allowance program", which operated to allow the manufacturer to reduce its wholesale price so that its dealer could meet retail price competition. The Court in *Lewis* responded to plaintiff dealer's argument, that the manufacturer's

standard wholesale prices were set artificially high in order to force dealers to seek price assistance, by stating:

> In the instant case, Mack simply determines the maximum amount, based on the information supplied to Mack by the dealer, by which Mack is willing to reduce its wholesale price (and thereby its profit) in order to assist the dealer in selling a Mack truck. In granting such a discount Mack may require the dealer to reduce its own profit as well. Mack has a right to ensure that the discount it affords its dealers is passed on to the customer. *We cannot accept Lewis' argument that Mack must lower its wholesale price to a figure Lewis deems attractive without requiring a commensurate reduction on Lewis' part.* (emphasis added) 714 F.2d at 846.

This Court further agrees with defendant that the *Lewis* decision is particularly persuasive authority in that the sales allowance program it upheld, as being neither anticompetitive in purpose or effect, shared the following determinative characteristic with defendants' program herein: the resale price was suggested by the dealer; the manufacturer never refused to sell its equipment because of the dealers pricing policies, nor threatened to terminate the dealer because of a dispute over resale pricing; the program did not have the effect of depriving the dealer of pricing freedom, but instead sought only to ensure that the discount be passed on to the customer.

Therefore, the Court accordingly finds that the defendants' are entitled to summary judgment as to Counts II and III as their sales allowance program does not constitute resale price maintenance or price-fixing in violation of section 1 of the Sherman Act.

2. *Standing under Section 2 of the Sherman Act, Count IV and under Section 7 of the Clayton Act, Count VI*

The basis of plaintiff's Section 2 claim, the monopolization count, and Section 7 claim, the acquisition of assets count,

stems from defendant CARRIER CORPORATION'S allegedly unlawful termination of plaintiff as its independent distributor and its replacement of plaintiff with a company owned factory branch.

Defendants argue that plaintiff lacks standing under section 4 of the Clayton Act, 15 U.S.C. § 15, which provides treble damages to any person injured by "reason of anything forbidden in the antitrust laws", to seek damages for its section 2 and section 7 antitrust claims because plaintiff has not alleged or suffered "antitrust injury" as required by the Supreme Court's decision in *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977). Rather, defendants assert that plaintiff's wrongful injury, if any, amounts to nothing more than claims for common law tort or contract violations.

■ Analysis of plaintiff's standing properly begins with the *Brunswick* opinion which instructs that in order for a private party to recover treble damages under section 4 of the Clayton Act they "must prove antitrust injury, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect either the *anticompetitive effect* of the violation or the *anticompetitive acts* made possible by the violation." (emphasis added) *Id.* at 490, 97 S.Ct. at 698. In other words, it is not enough that the plaintiff's injury would not have occurred but for the defendant's alleged violation of the antitrust laws; the injury must be the sort of thing the antitrust laws are intended to prohibit.

Plaintiff argues that the appropriate criteria for judging standing under section 4 of the Clayton Act is the more recent Supreme Court decision in *Blue Shield of Virginia v. McCready*, 457 U.S. 465, 102 S.Ct. 2540, 73 L.Ed.2d 149 (1982) which it quotes at great length. However, *Blue Shield* does not change this Court's analysis of "antitrust injury" under *Brunswick*. The Court in *Blue Shield*, in reaching its determination that the plaintiff therein had

standing under section 4 to challenge Blue Shield's policy of covering treatment by psychiatrists but not clinical psychologists, considered the above quoted language in *Brunswick* and expressly reaffirmed the *Brunswick* requirement that the injury to plaintiffs in antitrust cases must "flow from that which makes defendants' acts unlawful." *Brunswick, supra,* 429 U.S. at 489, 97 S.Ct. at 697. See, *Blue Shield,* 457 U.S. at 480, 102 S.Ct. at 2549–51. Moreover, the Supreme Court subsequently upheld this requirement again in its latest antitrust standing case, *Associated General Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 540, 103 S.Ct. 897, 910, 74 L.Ed.2d 723 (1983). As such this Court, in considering plaintiff's standing, remains concerned with the application of the *Brunswick* requirement that plaintiff's injury result from the defendants' anticompetitive conduct.

■ The Court's analysis, therefore, is directed towards whether plaintiff's injury in the instant case was caused either by the allegedly anticompetitive aspects of the challenged acquisition of its assets or by any anticompetitive acts made possible by the acquisition. This analysis is guided by the numerous judicial decisions which have consistently interpreted the *Brunswick* rationale to deny standing to plaintiff companies alleging violations of section 2 and section 7 in the acquisition of their assets. The decisions universally hold that in this type of situation plaintiffs' injuries were not attributable to or caused by any downward effect on competition, which is a prerequisite of any antitrust claim. See *McDonald v. Johnson & Johnson,* 722 F.2d 1370 (8th Cir.1983), *Chrysler Corp. v. Fedders Corp.,* 643 F.2d 1229 (6th Cir.1981), *A.D.M. Corp. v. Sigma Instruments, Inc.,* 628 F.2d 753 (1st Cir.1980). Similarly, application of the *Brunswick* rationale to the facts in the instant case convinces this court that the plaintiff lacks standing. As defendants succinctly explained at the oral argument on this motion:

[T]he point of all these cases is that whether or not the acquisition of plaintiff's assets or the taking over of its business by us had any effect on competition, whether or not that occurred, plaintiff would still be out of business; and thus, there is lacking the essential connection between its injury and the effect on competition that would confer standing under the antitrust laws.

The Court is not persuaded by plaintiff's attempt to limit the above-cited decisions' denial of antitrust standing to situations where plaintiff companies "voluntarily" withdrew from the market. Plaintiff argues specifically that the Court in *McDonald* distinguishes those cases where plaintiff companies "voluntarily" entered into agreements to sell their business and then later tried to back out of the deal, from those cases where, as plaintiff alleges in the instant case, plaintiff companies were forced out of the market by "coercive and predatory practices". Plaintiff bases its argument on the *McDonald* Court's reference, 722 F.2d at 1378, to three criminal cases wherein the United States successfully prosecuted monopolization claims against competitors who forced other competitors to sell. Plaintiff's reliance on these cases is misplaced, however, in that, as defendants point out, these cases "have absolutely *nothing* whatsoever to do with the standing of a private plaintiff to seek treble damages under section 4 of the Clayton Act". Furthermore, the Court also agrees with defendants' observation that the *McDonald* Court's use of the term "voluntary" was meant in a "very broad sense", encompassing more than uncoerced agreements to sell. This is evidenced by the *McDonald* Court's reference, at 722 F.2d 1376, note 7, to *Peterson v. Borden Co.,* 50 F.2d 644 (7th Cir.1931), an early case cited by the *Brunswick* Court which involved plaintiff stockholders who had allegedly been defrauded in the sale of their stock, as one of their controlling decisions.

The Court notes, moreover, that *Peterson* is not the only case cited as a controlling decision in *McDonald* which evidences the proposition that the use of the term

"voluntary" should be construed broadly. The *McDonald* Court also discusses, 722 F.2d at 1375, note 6, and 1377, the decision in *Turner v. Johnson & Johnson*, 549 F.Supp. 807 (D.Mass.1982), an acquisition of assets case involving allegations of fraud wherein the Court denied antitrust standing to the plaintiffs after analyzing the alleged injuries under the "antitrust injury" requirement of *Brunswick*. The *Turner* decision is instructive in that, as in the instant case, the plaintiffs alleged fraud and misrepresentation by the defendants in acquiring the assets of plaintiffs, and further alleged that the assets were acquired for the purpose of suppressing plaintiffs and eliminating competition. Plaintiffs therein brought a suit for fraud and antitrust violations under Sections 1 and 2 of the Sherman Act and Section 7 of the Clayton Act. The *Turner* Court, in denying antitrust standing, offered the following analysis as to why plaintiffs had failed to meet the *Brunswick* "antitrust injury" requirement:

> Any injury which AMEC suffered was due to the alleged business torts and the fraud on the part of J & J and not to any anticompetitive effect of the acquisition. "If the sale of [AMEC's] assets had an effect on competition, it would have occured whether or not [AMEC] was harmed. There is thus lacking the essential connection between injury and the aims of the antitrust laws necessary to give [AMEC] standing." Id. It was not the fact of AMEC's elimination as a competitor which caused its alleged injury; rather the injury resulted from the fraud and misrepresentation allegedly practiced by J & J during the negotiations and the acquisition. 549 F.Supp. at 811.

This Court similarly finds that the plaintiff in this case has neither alleged or suffered "antitrust injury". Accordingly, defendants are entitled to judgment on the pleadings as to Counts IV and VI as the plaintiff lacks standing to pursue these claims arising under Section 2 of the Sherman Act and Section 7 of the Clayton Act respectively.

### 3. *Market Power under Section 2 of the Sherman Act, Count IV*

As the Court has determined above that plaintiff lacks standing to pursue its section 2 claim, it need not reach defendants' alternative basis for summary judgment on the section 2 claim. Therefore, the Court expresses no opinion on the question of defendants' market power as it relates to sustaining a monopolization or attempted monopolization claim under section 2 of the Sherman Act.

### 4. *Standing under the Florida Deceptive and Unfair Trade Practices Act, Count XVII*

■ Defendants argue that the plaintiff lacks standing to pursue its claim under the Florida Deceptive and Unfair Trade Practices Act, Fla.Stat.Ann. § 501.204(1) because the relationship between the plaintiff and the defendants in the instant case did not involve the requisite "consumer transaction". As this Court recognized in *LJS Co. v. Marks*, 480 F.Supp. 241, 244 (S.D.Fla.1979), a private right of action for damages under the Act cannot be maintained unless the alleged unfair or deceptive acts or practices complained of involves a "consumer transaction", Fla.Stat. Ann. § 501.212(3), and, this Court further recognized that Florida Courts have strictly construed the definition of "consumer transaction".

As defined by the statute, a "consumer transaction" means:

> a sale, lease, assignment, award by chance, or other disposition of an item of goods, a consumer service, or an intangible to an individual for purposes that are primarily personal, family, or household or that relate to a business opportunity that requires both his expenditure of money or property and his personal services on a continuing basis *and in which he has not been previously engaged* or a solicitation by a supplier with respect to any of these dispositions. (emphasis added) *Id.* § 501.203(1).

Defendants' argument is specifically directed to the fact that plaintiff, who admits in its complaint to having been engaged in the heating and air conditioning business for more than 20 years, cannot fit within the "obvious purpose" of the second, or "business opportunity", clause of the above statutory definition of "consumer transaction", as it has been "previously engaged in the business involved". Fla.Stat.Ann. § 501.203(1). As the Florida Court in *Darrell Swanson Consolidated Services v. Davis,* 433 So.2d 651, 652 (Fla.Dist.Ct.App. 1983) explicitly held, "a cause of action for civil damages under Chapter 501 is legally insufficient in the absence of a showing that the plaintiff has not previously been engaged in the business involved."

Plaintiff argues in response that this Court's decision in *LSJ,* wherein it held that the plaintiff had no private right of action as its business was not a "consumer", was wrongly decided as it was written before the Act was amended to add subsection (9) of § 501.203, which now defines "consumer" to include businesses or corporations such as plaintiff. However, as the later court in *Packaging Corporation International v. Travenol Laboratories,* 566 F.Supp. 1480, 1481, noted, in endorsing this Court's decision in *LSJ,* the added definition of "consumer" does not alter the validity of [the *LSJ*] Court's reasoning." In construing the Act, the *Packaging* Court stated that "the statute appears to be directed to entities that have been traditionally thought of as consumers, in situations traditionally thought of as consumer transactions." 566 F.Supp. at 1483. Thus, the Court in *Packaging* found that whether or not the plaintiff fit the definition of "consumer" was immaterial in that the case involved did not fit the definition of "consumer transaction."

█ As such, this Court admits it is as "mystified" as the defendants as to why the plaintiff bases his argument on the changed definition of consumer when defendants' point is that the plaintiff cannot satisfy the other, equally crucial, definition of "consumer transaction". The Court ac-

cordingly finds that the plaintiff lacks statutory standing to pursue this claim under the Florida Deceptive and Unfair Trade Practices Act and, therefore, defendants are entitled to judgment on the pleadings as to Count XVII.

### 5. *Conspiracy Count XVIII under Florida Law*

Defendants' final argument is that plaintiff's claim for wrongful conspiracy under Florida law, Count XVIII, should be dismissed as a matter of law for failure to state a claim as it does not identify the requisite plurality of actors.

█ Plaintiff's Count XVIII specifically alleges that "the defendants herein wrongfully conspired to commit the wrongs above alleged, such conspiracy being engaged in willfully and maliciously". The Court notes, however, that Florida case law holds that members of a single economic unit, such as the named defendants herein, CARRIER CORPORATION, its wholly owned subsidiary CDCC, and the individual defendants who are all officers and/or personnel of CARRIER or its BDP unit, cannot constitute the requisite combination of "separate economic groups or forces" necessary to establish the Florida tort of conspiracy. See *Buckner v. Lower Florida Keys Hospital District,* 403 So.2d 1025, 1029 (Fla.Dist.Ct.App.1981).

In response, plaintiff contends that the allegations in the complaint also support a theory of "vertical coerced conspiracy" between the defendants and its distributors such as plaintiff to set resale prices, and, as such, the conspiracy counts are facially sufficient. This of course is the same argument advanced by plaintiff in regard to its section 1 antitrust claims. However, while federal law recognizes the theory of "vertical coerced conspiracy" in antitrust actions, federal law is not dispositive on plaintiff's Count XVIII which alleges a cause of action under the Florida tort of conspiracy. Whether this count states a cause of action is to be determined by Florida case law, and this Court is not aware of any Florida case law, nor has

plaintiff cited any, wherein a Florida Court has recognized a theory by which a plaintiff could recover damages for a conspiracy between itself and defendants to inflict wrong on the plaintiff. Accordingly the Court finds that defendants are entitled to judgment on the pleadings as to plaintiff's claim for wrongful conspiracy under Florida law, Count XVIII, as it fails to state a cause of action.

In conclusion, the Court, after carefully considering oral argument of counsel on defendants' motion at a hearing on October 1, 1984, and reviewing the several memoranda of law in support and in opposition thereto, herein does:

ORDER and ADJUDGE that defendants' joint motion for partial judgment on the pleadings as to Counts I, IV, V, VI, VII, VIII, XVII, and XVIII be, and it is, GRANTED. The Court does further:

ORDER and ADJUDGE that defendants' joint motion for summary judgment as to Counts II and III be, and it is, GRANTED.

This case is dismissed as to Counts I, II, III, IV, V, VI, VII, VIII, XVII, and XVIII.