37 F.3d 1505
 1994-2 Trade Cases P 70,779
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
LATTICE SEMICONDUCTOR CORPORATION, Plaintiff/Appellee,
v.
INTERFACE ELECTRONIC CORPORATION, Defendant/Appellant.
 No. 93-35215.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Sept. 14, 1994.
Decided Sept. 27, 1994.
 
 Before: ALDISERT*, TANG and THOMPSON, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 The primary issue for decision in this appeal is whether the district court erred in ordering summary judgment in favor of Lattice Semiconductor Corporation on its action sounding in goods sold and delivered and against Interface Electronic Corporation on its counterclaim alleging price fixing in violation of the Sherman Antitrust Act, 15 U.S.C. Sec. 1. We affirm.
 
 
 3
 Jurisdiction was proper in the district court based on 28 U.S.C. Sec. 1332(a)(1). This court has jurisdiction under 28 U.S.C. Sec. 1291. The appeal by Interface was timely filed under Rule 4(a) of the Federal Rules of Appellate Procedure. We review grants of summary judgment de novo, applying the same standards as would the trial court. Bassette v. Stone Container Corp., 25 F.3d 757, 759 (9th Cir.1994). In opposing a summary judgment motion in an antitrust case, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Electronics Indus. Co, Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. Rule 56(c). Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). The moving party has the initial burden of establishing the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party must then go beyond the pleadings and identify facts which show a genuine issue for trial. Id. at 324.
 
 I.
 
 4
 Lattice is a Delaware Corporation that manufactures and sells electronic components. Interface is a former distributor that was terminated by Lattice pursuant to a 90-day notice provision in the Distributorship Agreement between the parties.
 
 
 5
 Lattice agreed to supply Interface with products during the 90-day termination period on the condition that Interface comply with the contractual 30-day payment provision. Interface agreed and Lattice honored all orders up until the February 28, 1992 termination date. Lattice shipped all products ordered by Interface with delivery dates on or before February 28, including one order worth $118,000.00 which Interface had promised, but failed, to pay within 30 days. Lattice sued and, in its answer, Interface admitted the order, shipment, delivery and acceptance but insisted the contract was void for illegality. Interface filed an amended answer and counterclaim, and moved for a transfer of venue, which was denied. In its amended answer, Interface alleged for the first time that it was an unwilling co-conspirator in an illegal "minimum vertical price fixing scheme" forced upon it by Lattice. It charged that Lattice "continuously, systematically, regularly, repeatedly, and routinely refused to indicate to [Interface] what its 'cost' was in relation to a particular electronic component" and "dictated to [Interface] what its 'cost' would be for a particular electronic component or assembly subsequent to [Interface] actually quoting and/or selling same to its customer." 1 ER 55. It further alleged that Lattice threatened to penalize Interface in various ways if it refused to comply with the price fixing scheme. After the close of discovery, Lattice filed its motion for summary judgment.
 
 
 6
 The district court concluded that there was no illegal price-fixing scheme, that there was no competent evidence of an illegal contract or conspiracy and that "the coercion allegation is premised upon an unsubstantiated description of coercive techniques, and one unsupported typed memorandum that was drafted after this litigation began. This evidence fails to support defendant's allegations." 3 ER 97-98. It granted Lattice's motion for summary judgment on its claim for goods sold and delivered and against Interface on its counterclaim for violations of the Sherman Antitrust Act.
 
 II.
 
 7
 To understand Interface's allegation that Lattice forced it to participate in a minimal price fixing scheme, some background on the semiconductor market is necessary. Lattice manufactures semiconductors in a rapidly growing and aggressive market. The annual national revenues for the entire semiconductor distribution industry is approximately $10 billion. During Lattice's fiscal year ending March 30, 1991, it earned $64 million, less than one tenth of one percent of the industry's total revenue. Lattice sells its products primarily through a network of independent sales representatives and distributors. When a distributor places an order, Lattice charges a standard published "book cost," which is the standard wholesale price. It routinely establishes and publishes "book costs" at a level sufficient to enable the distributor to compete effectively. The record reflects that, although Lattice also publishes suggested retail prices, the distributor generally is free to charge whatever price it wishes on resale. 1 ER 146-147; Supp. ER 26, 138, 173.
 
 
 8
 Because of continually changing conditions, the market requires constant price adjustments. Lattice therefore maintains a pricing policy designed "to enable its distributors to receive discounts or rebates to compete in the volatile computer market." 3 ER 93. For example, Lattice and many other semiconductor manufacturers employ a price protection program to give distributors retroactive refunds on inventory on hand when the published book price of a component drops to meet market conditions.
 
 
 9
 Manufacturers of semiconductors also employ programs of temporary competitive allowances, which are price discounts, rebates or debits that lower the effective price of products to enable distributors to compete on larger orders. The program Lattice employs is called the "distributor price authorization" (DPA) program. Under the DPA program, a distributor such as Interface presents competitive market pricing information to Lattice or its factory representatives in a request for a reduced wholesale--or "broken"--cost that will allow it to meet particular competitive market conditions on a particular order while still realizing a profit. Joseph Oliveri, president of Interface, admitted in deposition that the only situation in which Lattice might dictate resale price is when Interface had requested Lattice to "break the book" under the DPA program. 1 ER 147.
 
 
 10
 The DPA program allows the manufacturer, in response to a request initiated by the distributor based on competitive pricing information on mark-up conditions supplied by the distributor, to lower the cost of particular products to the distributor and enable the distributor to compete on particular orders. When a distributor such as Interface learns that a customer is soliciting quotes from several vendors on a large order, it informs Lattice of the specific customer involved, the nature of the customer's potential order and the bids from competing manufacturers. The distributor also submits a proposed target price, designed to meet competition, as well as a requested broken cost. Supp. ER 95, 96.
 
 III.
 
 11
 Our starting point is Section 1 of Title 15:
 
 
 12
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal.
 
 
 13
 In order to succeed in its claim of a Sherman Act violation, Interface had to come forward with evidence of price maintenance by Lattice through its costing practices and an agreement or concerted activity by Interface and Lattice in restraint of trade. We conclude that Interface failed to meet its burden on all counts.
 
 A.
 
 14
 We are persuaded that there was no evidence of illegal price maintenance. Interface's president, Mr. Oliveri, conceded that Lattice's involvement in quoting approved resale prices for Interface was limited only to situations in which Interface had requested a broken cost from Lattice under the DPA program. 1 ER 146-47. Consequently, the district court properly focused on Interface's allegation of an antitrust violation as it related to Lattice's DPA program. Based on the testimony of Interface personnel, the district court concluded that the purpose of Lattice's DPA program was to encourage rather than restrain trade, that Interface regularly initiated the DPA process by presenting market information and requesting broken costs, that Lattice never conditioned sales to Interface on Interface's compliance with Lattice's resale price quotes and that there was "no supporting evidence that plaintiff 'routinely and continuously' withheld cost information." 3 ER 96.
 
 
 15
 Our review of the record substantiates the district court's conclusion that Lattice did not withhold cost information or improperly dictate resale prices. The testimony of Interface's own officers and employees flatly contradicted the allegations made in the pleadings.
 
 
 16
 Interface product manager Vanessa Brady, the employee most knowledgeable about how Lattice's pricing worked, corroborated Lattice's defense in all respects in her deposition. In a single line of questioning, Ms. Brady disclaimed knowledge of every substantive allegation contained in Interface's complaint. She testified that she did not believe Lattice punished Interface for its pricing policies, that Lattice never coerced Interface into maintaining minimum resale prices and that Lattice never threatened to withdraw its technical support or terminate Interface if it failed to comply with Lattice's pricing demands. Supp. ER at 146. She testified further that Lattice's DPA system helped Interface become "price competitive" with the competition and that Interface commonly initiated the process by presenting Lattice with competitive market information. She admitted that Lattice quoted broken prices in the same fashion as other manufacturers in the industry and testified that she could not recall any instance where she had requested a "cost" from Lattice's factory representative and had not received it or had been refused the information. Supp. ER at 144.
 
 
 17
 Moreover, Interface presented no other witnesses with any personal knowledge of Lattice "coercing" Interface into charging particular resale prices. Mr. Oliveri and Mr. Barhite, Interface's president and vice-president, denied any knowledge of such conduct. Although Mr. Matthews, Interface's director of marketing, in response to a leading question from Interface counsel, opined that Lattice required Interface to abide by resale prices quoted to it, he admitted to no personal knowledge of any price-related coercive conduct by Lattice or any threats to terminate Interface if it did not resell its product at a certain price. Supp. ER at 174-174A. Voicing an opinion totally devoid of factual support--indeed an opinion that contradicts his own deposition testimony--is not the type of evidence capable of supporting a summary judgment motion.
 
 
 18
 Mr. Oliveri recounted a single occasion when Lattice employees Jim Harshbarger and George Xiarhos allegedly threatened to terminate Interface if it did not follow Lattice's pricing policies, in July 1989 at the "Magna Computer meeting." However, Mr. Barhite, who was also at the meeting, produced contemporaneous handwritten meeting notes he kept of "anything important," which included no reference to any such threat. Moreover, he had no recollection of any threats being made. It is also relevant to note that Lattice and Interface continued there business relationship without event for three years until February 1992.
 
 
 19
 There was absolutely no evidence that Lattice ever conditioned an approved broken cost on Interface's agreement to charge a specific resale price or that Lattice ever withdrew an authorized broken cost or otherwise punished Interface for failing to charge a specific resale price. We are satisfied that the district court did not err in concluding that "the coercion allegation is premised upon an unsubstantiated description of coercive techniques, and one unsupported typed memorandum that was drafted after this litigation began. This evidence fails to supports defendant's allegations." 3 ER 97-98.
 
 
 20
 Courts of appeals and district courts in other circuits have uniformly upheld programs such as Lattice's DPA program. See, e.g., Lewis Service Center, Inc. v. Mack Trucks, Inc., 714 F.2d 842 (8th Cir.1983), cert. denied, 467 U.S. 1226 (1984); AAA Liquors, Inc. v. Joseph E. Seagram & Sons, Inc., 705 F.2d 1203 (10th Cir.1982), cert. denied, 461 U.S. 919 (1983); Bryant Heating & Air Conditioning v. Carrier Corp., 597 F.Supp. 1045 (S.D.Fla.1984). Virtually all major manufacturers of semiconductor chips employ similar programs. Supp. ER 94, 138-139. Given these descriptions of industry practices, and based on the testimony of Interface's officers and employees that served to deny every substantive allegation contained in the counterclaim, the district court did not err in granting summary judgment in favor of Lattice on Interface's claim of illegal price maintenance.
 
 B.
 
 21
 Even if Lattice's DPA program could be construed as an attempt to regulate resale prices, Interface failed to demonstrate the requisite concerted activity to prevail in its counterclaim.
 
 
 22
 To establish a "contract, combination, or conspiracy" under 15 U.S.C. Sec. 1, there must be a "concerted action of more than a single entity. Unilateral conduct by a single firm, even if it 'appears to "restrain trade" unreasonably,' is not unlawful under Section 1 of the Sherman Act." The Jeanery, Inc. v. James Jeans, Inc., 849 F.2d 1148, 1152 (9th Cir.1988) (citations omitted). A retail merchant was terminated by a clothing manufacturer in The Jeanery for selling products below the manufacturer's recommended retail price, thereby underselling other retailers. In The Jeanery, we outlined the rules necessary to establish an unlawful resale price maintenance agreement:
 
 
 23
 First, the rule of Colgate [250 U.S. 300] that a manufacturer can declare a resale price policy and refuse to deal with price-cutters is firmly entrenched in antitrust jurisprudence. See Monsanto [Co. v. Spray-Rite Serv. Corp.], 465 U.S. [752,] 761, 763, 104 S.Ct. [1464,] 1469, 1470. Second, because "a distributor is free to acquiesce in the manufacturer's demand in order to avoid termination," id. at 761, 104 S.Ct. at 1469, proof of an agreement must 'include[ ] more than a showing that the distributor conformed to the suggested price." Id. at 764 n. 9, 104 S.Ct. at 1471 n. 9. Third, an agreement to maintain prices may not be inferred from the fact alone that "a manufacturer and its distributors are in constant communication about prices and marketing strategy." Id. at 762, 104 S.Ct. at 1470. Finally, Monsanto cautions against permitting a jury to infer a concerted price-fixing agreement from highly ambiguous evidence. Id. at 763, 104 S.Ct. at 1470]. Inferences drawn from weak evidence pose the danger of eroding the scope of conduct permitted by the Colgate doctrine or with respect to nonprice vertical restraints. Id.; cf. Copperweld [Corp. v. Independence Tube Corp.], 467 U.S. [752,] 768, 104 S.Ct. [2731,] 2740 (explaining that courts must carefully scrutinize allegations of concerted conduct to ensure that aggressive procompetitive conduct of a single firm is not curtailed improperly).
 
 
 24
 The Jeanery, 849 F.2d at 1154. We further stated:
 
 
 25
 Certainly, then, a manufacturer may advise a dealer that its policy is to terminate a dealer who does not sell at [the suggested resale price], or to favor filling orders placed by complying dealers. This is legitimate pressure to get a dealer to sell at [the suggested resale price]. No inference of antitrust conspiracy can be drawn from such evidence. It is ambiguous at best.
 
 
 26
 Id. at 1159 (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 588, 106 S.Ct. 1348, 1357 (1986)). Finally, we noted:
 
 
 27
 The "common scheme" or "meeting of the minds" prerequisite to section 1 liability is not shown merely by a distributor's conformity to the suggested resale price. "It means as well that evidence must be presented both that the distributor communicated its acquiescence or agreement, and that this was sought by the manufacturer. And, as the Supreme Court recently has emphasized, there must be evidence of an "agreement on the price or price levels to be charged...."
 
 
 28
 Id. at 1155 (citations omitted).
 
 
 29
 Interface president Mr. Oliveri acknowledged that, if any coercion related to resale pricing occurred, it was tied to Lattice's DPA program, but his colleagues responsible for quoting resales denied personal knowledge of price-related coercive conduct by Lattice. The record discloses, at most, that on a single occasion Interface believed Lattice threatened it with termination if it did not quote approved broken prices on resale. However, even if we conclude that Lattice pressured Interface into reselling product at a certain price on threat of termination, there was no evidence that Interface communicated its acquiescence or agreement in order to create potential liability under Section 1 of the Sherman Act. Both Mr. Barhite and Mr. Oliveri admitted that they did not agree to any price-fixing demands allegedly made during the Magna Computer meeting, and Interface introduced no evidence that any other Interface employee acquiesced to the alleged price-fixing scheme. At most we have unilateral pressure by Lattice on Interface to adhere to Lattice's suggested resale pricing or face less favorable treatment, and a unilateral decision by Interface to comply. This is insufficient evidence of an antitrust violation under The Jeanery and the Supreme Court cases cited therein.
 
 C.
 
 30
 We are satisfied also that there was no evidence of unreasonable restraint of trade. Interface officers acknowledged that Lattice's DPA program was designed to increase competition rather than restrain it, and that the program had such an effect. Supp. ER 96, 139, 141, 145. Other semiconductor manufacturers employ similar programs, which have been upheld by courts of appeals and district courts, in order to promote competition in a volatile market. Interface made no showing that trade was unreasonably restrained as a result of Lattice's practices.
 
 
 31
 In light of our disposition in favor of Lattice on the merits in the antitrust claim against it, Appellant's contention that the court improperly permitted an in pari delicto defense is moot.
 
 III.
 
 32
 We conclude also that the district court did not err in granting Lattice summary judgment on its claim for goods sold and delivered. Within the 90-day window after notice and before Interface's termination as a distributor, it ordered from Lattice $1.1 million in product, requesting invoice and delivery dates spread out over seven months. Lattice agreed to supply goods to be delivered prior to the date of actual termination on the condition that Interface comply with the contract's 30-day payment provision and Interface acceded to the terms. Interface then requested $118,000 in products for delivery before February 28, 1992, assuring Lattice that it would pay on a net 30-day basis. However, after termination became effective, it refused to make payment, arguing that the goods had been misplaced. Supp. ER 80-81. Lattice sued Interface on May 1, 1992.
 
 
 33
 Little discussion is needed on Lattice's claim for goods sold and delivered. Under Oregon state law, in order to prevail on its claim, Lattice had to prove "(1) that defendant requested it to deliver certain goods, (2) that it delivered the goods, (3) the agreed or reasonable value of the goods and (4) that defendant did not pay." Crosby Paint Corp. v. Bi-Mart Co., 81 Or.App. 341, 345, rev. denied, 302 Or. 194 (1986). The undisputed facts show that Interface requested Lattice to deliver goods, that Lattice delivered the goods, that Interface and Lattice agreed upon the price or reasonable value of the goods and that Interface refused to pay. Because there has been no antitrust violation and because Interface admits that it agreed to purchase certain goods from Lattice which it received and for which it refused to pay, the district court did not err in granting Lattice's motion for summary judgment.
 
 IV.
 
 34
 Interface contends the district court erred in denying its motions to strike Lattice's objections to Interface's request to produce documents, to compel Lattice to produce documents and to transfer venue. We review for abuse of discretion rulings concerning discovery and discovery sanctions, Zimmerman v. Bishop Estate, 25 F.3d 784, 789, 790 (9th Cir.1994), as well as decisions regarding transfer of venue. United States v. Dischner, 974 F.2d 1502, 1523 (9th Cir.1992), cert. denied, 113 S.Ct. 1290 (1993).
 
 
 35
 Interface served Lattice with 51 requests for production of documents. Lattice served its response and objections to the request along with a letter indicating that approximately 6,000 documents had been accumulated. On two separate occasions, Lattice's counsel offered Interface the opportunity to review the documents in Portland or to have the documents copied at Interface's expense and shipped to its counsel in Massachusetts. On both occasions Interface's counsel failed to review the requested documents or to arrange for photocopying or shipping. When informed of these uncontested facts, the district court refused to grant Interface's motion to strike, which was filed at the close of discovery and moments before the scheduled hearing on Lattice's summary judgment motion. The court noted that Interface elected not to raise discovery motions sooner, even though it had numerous opportunities to do so. This was not an abuse of discretion.
 
 
 36
 Interface wanted this case tried in Massachusetts, notwithstanding the provision in its Distribution Agreement in which it agreed that disputes between the parties would be litigated in Oregon. Forum selection clauses in commercial context are prima facie valid. Carnival Cruise Lines, Inc. v. Shute, 499 U.S. 585, 595 (1991); M/S Bremen v. Zapata Off-Shore Co., 407 U.S. 1, 10 (1970). Such clauses may not be set aside unless the challenging party can show clearly that enforcement would be unreasonable and unjust or that the clause was invalid for reasons such as fraud or overreaching. Interface made no such showing, but rather argues that the forum selection clause is unenforceable because the entire contract was void for illegality. This argument is dependent upon a determination of antitrust violation and, because we conclude that there was no such violation, must fail. There was no abuse of discretion.
 
 V.
 
 37
 We have considered all arguments advanced by the parties and conclude that no further discussion is necessary.
 
 
 38
 The judgment of the district court is AFFIRMED.
 
 
 39
 Costs are taxed against Appellant.
 
 
 
 *
 Ruggero J. Aldisert, Senior Judge, United States Court of Appeals for the Third Circuit, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit as provided by the Ninth Circuit Rule 36-3